450 So.2d 1139 (1984)
Charles E. WALTERS, Margaret P. Walters, B.F. Jackson, III, Carolyn Jackson, William D. Coleman, Jackie W. Smith and Donna P. Smith, Appellants,
v.
Helen D. McCALL and Joan Vienot, Appellees.
No. AS-395.
District Court of Appeal of Florida, First District.
April 18, 1984.
Rehearing Denied May 17, 1984.
*1140 George R. Miller, DeFuniak Springs, for appellants.
William H. Green and Angus G. Andrews, DeFuniak Springs, for appellees.
ERVIN, Chief Judge.
This cause involves a challenge, initiated by appellants as owners of certain lots within a servient parcel of land, to development by appellees of two dominant parcels into a campground, and to use by the patrons of the campground of a five-foot pedestrian easement across the servient parcel. Appellants contend that use of the easement by campground patrons, not owners of the dominant parcels, was not within the contemplation of the parties when the easement was created. We agree and reverse.
In April of 1979, Panhandle Realty Ventures, Inc. (Panhandle) and its president, William Hulsey, purchased without restrictions three parcels of property in Walton county, hereinafter referred to as Parcel A  a gulf-front parcel, Parcel B  a triangular parcel north of Parcel A and across a highway from it, and Parcel C  a parcel north of and across another highway from Parcel B.[1] In May of 1979, Panhandle conveyed a portion of Parcel C, measured by metes and bounds, to G. Candler Holmes by warranty deed later recorded in the public records, containing the following restrictions:
1. This property shall only be used for residential purposes and no dwelling shall be constructed on said property with less than 1000 square feet of heated area.
* * * * * *
3. No structure of a temporary character, trailer, mobile home, basement, tent, shack, garage, barn or other out building shall be used on this property at any time as a residence either temporary or permanent.
(e.s.)
Also in May, Hulsey began construction of a single family residence for his own use on the eastern half of Parcel B. Subsequently, in September of 1979, to satisfy a debt owed by Holmes and Hulsey, a portion of Parcel C owned by Holmes was conveyed to Bell with a continuation of the restrictions that were set forth in the deed to Holmes.
Through real estate agent Van Ness Butler, Panhandle sold Parcel A to appellant, attorney William Coleman, in December of 1979. Coleman prepared the warranty deed containing no restrictions other than the following provision for an easement:
Grantor reserves, unto itself, its successors and assigns, a 5 foot walk easement for pedestrian traffic, only, for ingress and egress from State Road 395 to the *1141 beach, along the eastern most 5 feet of ... [Parcel A]. Said 5 foot walk easement is reserved solely for the benefit of the owner or owners of ... [Parcels B and C].
(e.s.) The deed containing the above reservation was executed on December 12, 1979, and recorded on December 18, 1979.
Butler testified that during the negotiations leading to the sale of Parcel A to Coleman, he did not recall any discussions concerning the purpose or limitations of the easement, and that he did not represent to Coleman that restrictions were intended on the use of Parcels B and C. Hulsey did express to Butler his desire to reserve the easement appurtenant to Parcels B and C to increase their marketability and value by providing an access from those parcels to the gulf.
Meanwhile, Hulsey employed a land surveyor to perform a boundary survey and division of Parcel C into lots. In May of 1980, the survey with legal descriptions of nine lots was completed for the purpose of estimating the market value of the property, although lot numbered eight, which encompassed that part owned by Bell, was excluded from the value calculations. The subdivision was not recorded in the public records.
Coleman testified that when he purchased Parcel A from Hulsey, his understanding and intention was that the five-foot pedestrian easement would be used by the owner of Hulsey's house, located in Parcel B, and his guests, as well as the persons owning lots in Parcel C. In February of 1980, Coleman recorded a plat dividing Parcel A into five lots for resale, subjecting the five lots to the five-foot pedestrian easement as set forth in his deed from Panhandle, imposing restrictive covenants limiting use of the lots for residential purposes only, requiring minimum square footage in the dwelling structure, and prohibiting mobile homes, house trailers or similar structures from being used for any length of time as a residence, or from being kept or maintained on the property. During late 1980 and early 1981, Coleman sold three of the lots in Parcel A to the various other appellants, subject to the easement and restrictive covenants.
Interested in purchasing Parcel C and the western half of Parcel B, appellees McCall and Vienot contacted Butler in early 1981, and expressed their desire to use the property as a campground. Butler informed them of the five-foot pedestrian easement to the beach, and advised them to consult an attorney regarding whether campground patrons would be permitted to use the easement. Satisfied, after seeking the advice of their attorney, that campers would be able to do so, appellees next arranged in the spring of 1981 for the purchase of Parcel C in its entirety, pursuant to Hulsey's successful arrangement for repurchase of the portion owned by Bell, and the western-half of Parcel B, adjacent to Hulsey's residence. Accordingly, Panhandle conveyed Parcels B and C to appellees in April, 1981, and Bell conveyed his portion of Parcel C to appellees by warranty deed, purporting to release his legal interests in the restrictive covenants record, while Panhandle simultaneously executed a quitclaim deed to appellees conveying the same portion of Parcel C, seeking to release the restrictions which Panhandle had previously placed upon it.
After learning that appellees were setting up a campground on Parcel C, Coleman testified that he informed them that campground patrons who were not owners of property in Parcels B and C had no right to use the easement. He had contemplated, he testified, that when he purchased Parcel A, Parcels B and C would be restricted to residential use because he was then aware that Holmes' lot was so restricted and that a single family residence had been constructed on a portion of Parcel B. His intent, he stated, in drafting the language of the easement was to limit travel over the easement to the predestrian traffic of owners of Parcels B and C. He admitted, however, that the scope of the easement was poorly drafted and that the language of the easement could encompass use by a multitude of unit owners if condominiums *1142 were constructed there on the dominant parcels.
Hulsey testified that he never intended, or represented to Butler or Coleman, that the use of Parcels B and C would be restricted to residential or any other particular use. He did sell the Parcels to appellees free of any use restrictions, with knowledge of their intent to operate a campground, and told them that pedestrian travel over the easement by patrons of the campground was permissible.
The trial court entered an amended final judgment, holding that the parcels purchased by appellees were free of any use restrictions and covenants in issue, that the owners of Parcels B and C and their successors in title were entitled to use the easement for access to the gulf for pedestrian traffic, and that patrons of the campground were entitled to benefit from use of the easement, but that the language limiting the use of the easement to travel by pedestrians did not include travel by dogs or other pets, although they could be carried across the easement by persons lawfully entitled to use the easement. We cannot agree with the court's conclusions permitting pedestrian travel over the easement by non-owners.
It is well established that an easement may be created by grant, a broad term which includes creation by reservation in a deed, and, as in deeds generally, the intent of the parties in a grant of easement is determined by a fair interpretation of the language. The language employed should be construed to effectuate the intention of the parties. See 20 Fla. Jur.2d Easements §§ 6, 13, 14, 18 (1980). In the instant case, the language employed to create the easement does not clearly specify those classes of persons entitled to use the easement. The broad construction placed upon the term by appellees is that the value of the campground is enhanced by providing to campers access to the gulf, thereby yielding a benefit to the owners. Appellants, on the other hand, urge that the reservation of the easement "solely for the benefit of the owner or owners" should be construed to mean that the easement was reserved solely for pedestrian travel by the residential owner or owners themselves of property in Parcels B and C.
When the language of a deed is clear and certain in meaning, and the grantor's intention is reflected by the language employed, there is no room for judicial construction of the language nor interpretation of the words used  if there is no ambiguity in the wording then the intention of the grantor must be ascertained therefrom. Saltzman v. Ahern, 306 So.2d 537 (Fla. 1st DCA 1975). An unrestricted grant of an easement conveys all such rights as are incidental and necessary to the reasonable and proper enjoyment thereof. If, however, the instrument specifically states the uses or purposes for which the easement was created, the use of an easement must be confined strictly to the purposes for which it was granted or reserved and it cannot be enlarged by any change in the use or character of the dominant estate. 20 Fla.Jur.2d Easements § 33 (1980). In cases such as the one before us, however, where the wording is ambiguous such that the scope of the easement cannot be determined from the plain meaning of the language employed, the legal extent of the right must be ascertained from the intention of the parties, in light of the surrounding circumstances, at the time the easement right was created.
A general principle governing all easements is that "the burden of right of way upon the servient estate must not be increased to any greater extent than reasonably necessary and contemplated at the time of initial acquisition." Crutchfield v. F.A. Sebring Realty Co., 69 So.2d 328, 330 (Fla. 1954). In other words, the easement holder cannot expand the easement beyond what was contemplated at the time it was granted. See Star Island Associates v. City of St. Petersburg Beach, 433 So.2d 998 (Fla. 2d DCA 1983). Crutchfield recognized that an implied right to do what is necessary for the full enjoyment of the easement itself accompanies every easement, but that such right is limited and *1143 must be exercised in a reasonable manner so as not to injuriously increase the burden upon the servient estate. 69 So.2d at 330.
Coleman's intent in drafting the questioned language restricting the use of the easement for the benefit of the owner or owners of the dominant estates is best evidenced by the use to which the three parcels were put at the time of the creation of the easement: the dominant two were used excusively for residential purposes. Hulsey had already begun constructing a residence on Parcel B. Indeed, one lot contained in Parcel C was restricted by warranty deed recorded in the public records for residential purposes only, and a specific bar was placed on structures of temporary character. It is significant that at the critical time at issue no commercial use was either made of any of the three parcels, nor was any such use allowed in any recorded public document.
We therefore conclude that travel over the easement by patrons of the campground was not a use contemplated by the parties at the time the easement was created, and such travel constitutes an impermissible expansion of the scope of the easement beyond that intended by the parties. The easement, rather, was created solely for the benefit of the owner or owners of Parcels B and C, and such use reasonably extends to their families, guests, and such persons' pets which, as the lower court concluded, must be carried across the easement, but it does not include temporary use as part of a commercial enterprise by campground patrons.
Appellants also assert that the Holmes/Bell portion of Parcel C may not properly be developed as a commercial campground because it remains subject to the residential use restrictions and, consequently, that the campground patrons temporarily residing on that portion of Parcel C are not entitled to use the easement. We have already held that campground patrons are not permitted to travel over the easement. In any event, although restrictive covenants made by a common grantor for the benefit of all grantees may be enforced by one remote grantee against another remote grantee when a common grantor intends to create a uniform building plan or scheme of restrictions, Nelle v. Loch Haven Homeowners' Association, Inc., 413 So.2d 28 (Fla. 1982), the right to enforce such restrictions pursuant to a general scheme must be reciprocal  the same restrictions must apply substantially to all lots of like character or similarly situated. See Mundy v. Carter, 311 So.2d 773 (Fla. 1st DCA 1975). Parcel A, as purchased by Coleman, was not subjected to any restrictions and only later did Coleman, of his own initiative, place residential use restrictions on his own property. Consequently, we conclude that appellants are not similarly situated grantees who are entitled to enforce the residential use restrictions placed on that portion of Parcel C which was conveyed to Holmes.
We do not address appellant's remaining points in that they are mooted by our disposition of the above issues.
The judgment of the trial court is affirmed in part and reversed in part and the cause remanded for further consistent proceedings.
SMITH and NIMMONS, JJ., concur.

*1144 APPENDIX

NOTES
[1] The three parcels and the five-foot easement in question are depicted by the sketch in the attached appendix.