806 P.2d 1068

**Lyndol L. WILCOX and Betty L. Wilcox, Plaintiffs–Appellants,**

**v.**

**TIMBERON PROTECTIVE ASSOCIATION, a New Mexico corporation, et al., Defendants–Appellees.**

**No. 10850.**

Court of Appeals of New Mexico.

Dec. 20, 1990.

Certiorari Denied Feb. 13, 1991.

Beverly J. Singleman, Stephen A. Hubert, Martin, Cresswell, Hubert, Hernandez & Roggow, P.A., Las Cruces, for plaintiffs-appellants.

Thomas A. Sandenaw, Jr., Barbara J. Vigil, Weinbrenner, Richards, Paulowsky & Sandenaw, P.A., Las Cruces, for defendant-appellee Timberon Protective Ass'n.

Lisa K. Durrett, Charles W. Durrett, Durrett, Jordon & Durrett, P.C., Alamogordo, for defendants-appellees Shackleford, Jordan, Dempsey, Rhodes and Gray.

## OPINION

APODACA, Judge.

The original opinion filed September 27, 1990 is hereby withdrawn, on the court's own motion, and the following opinion is substituted in its place.

Plaintiffs Lyndol and Betty Wilcox appeal the trial court's judgment entered after a bench trial in favor of defendants Timberon Protective Association (TPA) and individual lot owners. Plaintiffs had brought suit against defendants, seeking a declaratory judgment and injunctive relief

to enforce certain subdivision restrictive covenants prohibiting the use of "mobile homes" as residences. After entry of judgment, the parties were ordered to bear their own costs and attorney fees. TPA cross-appealed, challenging only the ruling on costs. The cross-appeal was not docketed and is thus deemed abandoned. *See* SCRA 1986, 12–208.

Plaintiffs' appeal takes issue with the trial court's finding that, because the disputed "mobile homes" were converted to permanent residences, there was no violation of the restrictive covenants. Alternatively, the trial court ruled that, even if the covenants had been intended to prohibit all mobile homes, conditions had so changed that the restrictive covenants were no longer valid or enforceable. Additionally, the trial court concluded that, under a "balancing of hardships" test, plaintiffs were relegated to an action at law for damages only. It also ruled in favor of defendants on their defenses of good faith immunity, mistake of law, laches and estoppel.

Under their first three issues on appeal, plaintiffs contend the trial court erred in holding that: (1) the restrictive covenants, based upon the developer's testimony, were ambiguous with respect to whether mobile homes or only temporary structures were prohibited; (2) defendants' residences did not violate the covenant because their mobile homes were fully converted from "mobile" structures to permanent residences; and (3) substantial evidence supported the determination that the mobile homes were affixed to the realty. We agree with plaintiffs on issue one and hold that, as a matter of law, the restrictive covenants are not ambiguous. We consequently conclude the trial court erred in allowing extrinsic evidence to determine the intent of the covenants. We believe the covenants' intent was to prohibit the use of "mobile homes" as permanent residences at any time. For these reasons, we reverse the trial court and hold that plaintiffs are entitled to the relief requested, a declaratory judgment and an injunction against future violations of the covenants.

Because we conclude the restrictive covenants are not ambiguous, we need not reach plaintiffs' second and third issues. On plaintiffs' remaining issues, we reverse the trial court's judgment as to all defendants, excepting the judgment in favor of defendants Cyrus and Gladys Gray (the Grays), which we affirm. Our reversal is based on our determination that the trial court abused its discretion in denying plaintiffs' requested relief. This denial was premised on the trial court's findings favorable to defendants on the affirmative defenses pled by them. Our determination is founded on the criteria for the granting of injunctive relief set forth in *Cunningham v. Gross*, 102 N.M. 723, 699 P.2d 1075 (1985).

With respect to the Grays, however, we hold they are legally entitled under covenant "H" to retain their present structure on their land. Covenant "H" exempts any lot owner from fully complying with the remaining restrictive covenants, if the Architectural Control Committee fails to approve within thirty days the lot owners' written building proposals or if no suit to enjoin the construction has been commenced before completion. From the facts presented to this court, we conclude that the Grays obtained Architectural Control Committee approval for placing their mobile home on the property and finished the building improvements before the filing of the suit giving rise to this appeal. On plaintiffs' final issue, we hold plaintiffs are entitled upon remand to entry of judgment against any defaulting defendants.

FACTS

Timberon, a large, planned resort community located in Otero County, is owned by subdivider North American Land Development, Inc. (the developer). The development encompasses 9,360 acres of mountainous terrain heavily covered with timber and consists of 33 separately developed subdivisions containing lots owned by a total of 4500–5000 property owners. The majority of the property owners, including plaintiffs and defendants, do not live full-time in Timberon.

Beginning in 1969, the developer prepared and recorded separate sets of restrictive covenants applicable to each of the subdivision units, as they were individually developed. Initially, the developer was in charge of architectural control and security duties within the subdivisions. In 1981, these responsibilities were assigned by written agreement to Timberon Property Owners Association (TPOA). TPOA later assigned these responsibilities to TPA in 1983. From September 1983 to time of trial, TPA had the authority and responsibility to approve or disapprove written building plans submitted by property owners and to enforce the restrictive covenants in Unit T–10.

Plaintiffs and the individually named defendants were all owners of residential lots in Unit T–10, one of the thirty-three units developed in Timberon. In 1979, the developer opened Unit T–10 for development and subdivided the unit into approximately 400 lots. Over 300 lots were designated for residential use, with the remainder set aside for commercial use. The developer recorded a set of restrictive covenants applicable to Unit T–10. These restrictive covenants contained provision D, which provided:

> No trailer, mobile home, basement, tent, shack, garage, barn or other outbuilding shall at any time be used as a residence, nor shall any residence of a temporary character be erected or permitted to remain. However, contractors may use a temporary building during the course of construction. And a travel trailer may be used as a temporary residence for a period of up to thirty (30) days if it is not connected to a water line and septic tank and if it is so connected, then the travel trailer may be used for a period of up to one-hundred eighty (180) days out of any one year period. The travel trailer must be removed from the lot during the remaining balance of each year.

In the early 1970's, the developer sought advice from an attorney on the question of whether installation of the newer double-wide manufactured units would violate the language of provision D and similar covenant provisions of subdivisions like Unit

T–10. The question had been raised by several property owners. Based on the legal advice obtained, the developer began allowing double-wide mobile homes as permanent residences throughout the subdivisions, if certain conditions were met.

TPA, while acting as the Architectural Control Committee, continued to follow this precedent set years before by the developer. As a condition for allowing "mobile homes" to be used as residences, TPA required that the wheels, axles, and tongue be removed from the unit, that the unit be placed upon a permanent foundation and that the unit comply with the minimum square footage requirements. If the exterior was sheet metal, TPA required that it be covered with stucco, brick, stone, or other veneer material.

According to the county tax assessor, however, except for one mobile home, none of the thirteen mobile homes located in Unit T–10 that he had checked were being taxed as permanent structures. According to his testimony, when a mobile home was permanently affixed to the realty, it was then considered a permanent residence and taxed as real property and not personalty. To be considered a permanent residence or structure for tax purposes, the "mobile home" had to be placed on a permanent foundation, with the hitch or tongue and wheels removed. The foundation had to be constructed of either a continuous concrete stemwall, pier and beam construction (with the piers located no more than ten feet apart), or mortared cinderblock. Although defendant Rhodes testified his mobile home in Unit T–10 was being taxed as a permanent residence, his residence was not the exception identified by the tax assessor.

In the fall of 1979, plaintiffs went to see lots in Timberon. The only mobile home they observed in their sales tour was a country store unit located in a commercial area. They did not know at that time whether this mobile home was in Unit T–10 or in some other unit. At this particular time, there were apparently three mobile homes already located within the subdivision. Plaintiffs, however, did not see them

and were not even aware of their existence. Before plaintiffs purchased their first lot, the salesman told them that mobile homes were not permitted in Unit T–10. Plaintiffs saw and read the restrictive covenants before purchasing their lots.

In compliance with the covenants, plaintiffs built their own stick-built cabin in 1981. Later that year, they noticed three mobile homes in Unit T–10. At that time, Tom Cook was President of TPOA. Plaintiffs spoke to him on two occasions in 1982 to report the illegal mobile homes. Mr. Cook told plaintiffs that two mobile homes were being used temporarily by construction people doing utility work. These two mobile homes were later removed from the subdivision.

When TPA assumed the architectural control function in late 1983, plaintiffs once again complained of the existence of certain "illegal" mobile homes. This complaint was addressed to Willie Fenske, a TPA board member. Mr. Fenske presented plaintiffs' objections to the TPA board. However, after the developer commenced a mobile home dealership in Timberon during this period, plaintiffs noticed a significant increase in the use of mobile homes as residences in Unit T–10.

When plaintiffs' lawsuit was filed, there were approximately 17 mobile homes and 15–17 conventional stick built homes in Unit T–10. After the filing of the lawsuit, six owners removed their mobile homes. Except for defendant Grays' mobile home, which plaintiffs first noticed in 1984, plaintiffs had never seen or known about the other defendants' mobile homes. They did not discover the remaining mobile homes until they conducted a survey of the 412 lots within the subdivision in 1985 for purposes of filing this lawsuit. The defendants who appeared at trial had moved their respective "mobile homes" onto their lots in either 1983 or 1984. Plaintiffs did not discover until December of 1985 that TPA itself was actually issuing written permits and approving the use of mobile homes under an unwritten, informal policy. After this discovery, plaintiffs filed their lawsuit.

## DISCUSSION

### A. *Unambiguous Restrictive Covenant*

We believe the trial court erred in concluding that the facts in this case were governed by the rationale in *Heath v. Parker*, 93 N.M. 680, 604 P.2d 818 (1980). The trial court held that, in light of the developer's testimony, the restrictive covenants were ambiguous. This ambiguity arose, the trial court reasoned, because it was uncertain whether only temporary structures were intended to be prohibited. *Id.* In reaching its conclusion on ambiguity, the trial court did not consider the plain language of the covenants, as recorded. Instead, the court went outside the four corners of the document to interpret the restrictions in light of the developer's unexpressed intent. Extrinsic evidence is not allowed when a document is unambiguous. *Northrip v. Conner*, 107 N.M. 139, 754 P.2d 516 (1988); *Schleft v. Board of Educ. of the Los Alamos Pub. Schools*, 109 N.M. 271, 784 P.2d 1014 (Ct.App.1989).

■ In determining whether restrictive covenants will be enforced as written, courts are guided by certain general rules of construction. *Cain v. Powers*, 100 N.M. 184, 668 P.2d 300 (1983), which we now summarize. When the covenant is subject to ambiguity, the restrictive covenants will be resolved in favor of the free enjoyment of the property and against the restriction. *Id.* Restrictions on land use will not be read into covenants by implication. *Id.* Restrictive covenants must be considered reasonably, though strictly, so that "illogical, unnatural or strained construction" will not be affected. *Hyder v. Brenton*, 93 N.M. 378, 381, 600 P.2d 830, 833 (Ct.App. 1979). Finally, words in a restrictive covenant must be given their ordinary and intended meaning. *Cain v. Powers*.

Here, the trial court attempted to create a meaningful difference between a "mobile home" and a "mobile" home. The first definition, which emphasizes both words, refers to the type of housing based on the nature of the structure's construction. The

second definition, with the emphasis on the first word only, relies on the mobility and permanence of the dwelling. We find this distinction to be without substance. New Mexico's Regulation and Licensing Department's Manufactured Housing Division defines "manufactured homes" as any movable or portable housing structure over thirty-two feet in length or over eight feet in width constructed to be towed on its own chassis and designed to be installed with or without a permanent foundation as a residential habitation. The term "mobile home" is not ambiguous for the very reason that it has a singular, ordinary meaning. Whether ambiguity exists is a question of law. *Schleft v. Board of Educ. of the Los Alamos Pub. Schools.*

 Instead of looking at the plain meaning of "mobile home," the trial court erroneously allowed the developer's testimony to clarify whether the intent of the covenant was to prohibit mobile homes altogether or to prohibit temporary structures. In determining whether a document is ambiguous, the standard is whether the instrument is reasonably and fairly susceptible of different constructions. *Levenson v. Mobley,* 106 N.M. 399, 744 P.2d 174 (1987). The secret, unexpressed intentions of the developer are not admissible to interpret the meaning of a covenant running with the land. *See, e.g., Moss Dev. Co. v. Geary,* 41 Cal.App.3d 1, 115 Cal.Rptr. 736 (1974); *Coffman v. James,* 177 So.2d 25 (Fla.Dist.Ct.App.1965). "While it may be that a mistake was made in the drafting of the covenants, the buyers of lots within the subdivision must be able to rely on the expressed intentions of the subdivider. They cannot be expected to guess at the secret intention of the developers." *Hines Corp. v. City of Albuquerque,* 95 N.M. 311, 313, 621 P.2d 1116, 1118 (1980). The developer's testimony may not be used to decide what is essentially a threshold question—is the covenant, as it reads, ambiguous?

 Restrictive covenants are to be enforced where the clear language, as well as the surrounding circumstances, reveal an intent to restrict land use. *See Cunning-*

*ham v. Gross.* An unambiguous restriction will be enforced as written. *Dempsey v. Apache Shores Property Owners Ass'n,* 737 S.W.2d 589, 592 (Tex.Ct.App.1987). Ambiguity exists if the provision is susceptible to two or more meanings. *Id.* The term "mobile home" has no such double meaning.

To us the covenant is clear—mobile homes are excluded and the term mobile home is not elusive of meaning, or otherwise vague, or ambiguous. Hence, we need not concern ourselves with the rule of construction which says that if there is doubt we should lean away from any restrictions on use. Mobile homes are different from conventional homes. This difference is the basis for the restriction.

*Brownfield Subdivision, Inc. v. McKee,* 19 Ill.App.3d 374, 376, 311 N.E.2d 194, 196 (1974).

According to our supreme court's interpretation, "[t]he term mobile home is an advertising euphemism for a large house trailer." *Cain v. Powers,* 100 N.M. at 187, 668 P.2d at 303 (quoting *Timmerman v. Gabriel,* 155 Mont. 294, 298, 470 P.2d 528, 530 (1970)). "Although the larger models of mobile homes are considerably less mobile than the smaller models, they are essentially similar in structure and appearance." *Id.* The restrictive covenant in question here clearly and unambiguously prohibited the use of a mobile home as a residence *at any time.* Although some of the terms used in paragraph D admittedly may be deemed ambiguous, these terms were not at issue.

Defendants' position is that the term "mobile home," by itself, like the term "trailer" in *Heath,* is ambiguous. However, in *Cain,* the court held that use of the term "trailer house" reflected the clear intent of the restrictive covenant. Additionally, the court noted that the terms "house trailer" and "mobile home" are used interchangeably. *Cain,* decided after *Heath,* specifically limited *Heath* to the facts present in that case and overruled it with respect to any inconsistency with *Cain.* Plaintiffs filed suit long after *Cain* was

decided. *Cain* thus is the controlling authority in this appeal.

Defendants rely on cases holding that placement of a trailer on a foundation and connecting it with water, sewer, and other utilities remove the portable characteristics and convert the structure into permanent housing, which is not prohibited by the covenant. *See, e.g., Frander & Frander, Inc. v. Griffen,* 457 So.2d 375 (Ala.1984); *Hussey v. Ray,* 462 S.W.2d 45 (Tex.Civ. App.1970). These cases, however, deal with the transient nature of the dwelling, which is greatly reduced when mounted on a permanent foundation. We believe the restrictive covenant being construed here, on the other hand, is directed at the *type of structure* prohibited, such as trailer, basement, tent, shack, garage, barn or other outbuildings. *See Timmerman v. Gabriel.* There is nothing temporary about basements or garages.

By failing to apply general rules of construction, the trial court erred as a matter of law in concluding that the restriction against mobile homes was ambiguous. It reached its conclusion by erroneously relying on the drafter's testimony on his unexpressed intentions, rather than by interpreting the covenant's intent directly from the words themselves. It is irrelevant what the developer intended (a question of fact to be reached only if the words used are unclear) if the actual words, as here, are otherwise unambiguous (a question of law). *Cf. Walters v. McCall,* 450 So.2d 1139, 1142 (Fla.Dist.Ct.App.1984) (when the language of a deed is clear and unambiguous, there is no room for judicial construction of the language nor interpretation of the words used).

B. *Affirmative Defenses*

We necessarily must address defendants' equity arguments, inasmuch as we have determined that the restrictive covenant is unambiguous. The trial court alternatively denied plaintiffs' request for injunctive relief to enforce the restriction against mobile homes based on defendants' affirmative defenses. The court relegated plaintiffs to a remedy at law for damages. We now decide whether any or all of the present individual defendants are exempt from being enjoined under any of the affirmative defenses pled.

█ With respect to defendants Gray, we hold they are exempt from compliance with the restriction under the terms of covenant "H." The Grays therefore are not required to remove their mobile home from their property. Covenant "H" states:

The Architectural Control Committee's approval or disapproval * * * shall be in writing. In the event the Committee, or its designated representative, fails, within thirty (30) days after the plans and specifications have been submitted to it, to approve or disapprove the same, or in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, written approval will not be required, and the related covenants shall be deemed to have been fully complied with.

The Grays obtained the Architectural Control Committee's approval for their housing structure and construction was completed before the filing of plaintiffs' suit.

On the remaining affirmative defenses, we reverse and remand with instructions to grant plaintiffs' requested injunctive relief. In considering injunctive relief to protect property rights, the trial court clearly invokes its equity powers. *Cunningham v. Gross.* Historically, restrictive covenants are used to assure uniformity of development within an area guaranteeing individual lot owners some degree of environmental stability. *Montoya v. Barreras,* 81 N.M. 749, 473 P.2d 363 (1970). Restrictive covenants are mutual, reciprocal, equitable easements that constitute valuable property rights for *all* lot owners within the restricted area. *Id.* To allow individual lots within the area to be relieved of the burden of the covenants would destroy the right to rely on such covenants, which right traditionally is upheld by our law of real property. *Id.*

█ Any request for injunctive relief is directed to the sound discretion of the trial court. *Cunningham v. Gross.* In considering whether to grant an injunction, New

Mexico courts generally will consider a number of factors and balance any existing equities and hardships. *Id.* The factors include: (1) the character of the interest to be protected; (2) the relative adequacy to the plaintiff of an injunction, when compared to other remedies; (3) the delay, if any, in bringing suit; (4) plaintiff's misconduct, if any; (5) the interests of third parties; (6) the practicability of granting and enforcing the order or judgement; and (7) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied. *Id.* The trial court in this appeal alternatively denied plaintiffs' requested injunctive relief based on defendants' affirmative defenses.

The affirmative defenses upheld by the trial court are relevant to weighing and balancing the *Cunningham* factors. The court's findings on the affirmative defenses pled in the present case wrongly weighed such factors in favor of defendants. Although it is not within our purview as a reviewing court initially to weigh all relevant factors, we conclude there was a lack of substantial evidence in the record to support the trial court's findings upholding the defenses. *See id.* We consequently hold that the trial court abused its discretion in denying the injunction. In support of our holding, we discuss each *Cunningham* factor individually.

### 1. *Character of Interest Protected:*

The interest to be protected by the covenant in question is the architectural and aesthetic integrity of the pertinent subdivision, Unit T–10. The trial court's findings regarding all other subdivisions in the area are irrelevant. We are concerned only with the changed conditions within Unit T–10. These changes must be substantial enough to frustrate the architectural and aesthetic interest protected by the restrictive covenant.

■ To succeed in a lawsuit to extinguish a restriction on property due to a change in conditions, a property owner must prove that, through no fault or neglect of his own, there have been such radical changes in the surrounding area so

as to frustrate the original purposes and intentions of the parties. *See Mason v. Farmer*, 80 N.M. 354, 456 P.2d 187 (1969) (quoting *Chuba v. Glasgow*, 61 N.M. 302, 305, 299 P.2d 774, 776 (1956)). At the time of trial, out of 412 lots in the subdivision, there were approximately ten lot owners in Unit T–10 who had mobile homes on their lots. We note, again, that the subject covenant was applicable to Unit T–10. There was evidence that, in other subdivisions, mobile homes were expressly authorized. Under these circumstances, we decline to hold that the number of mobile homes in other subdivisions was relevant in considering the first factor. Otherwise, the developer might be in a position to change the covenants unilaterally. In any event, we see no reason why we should not treat Unit T–10 as a unique area within the larger group.

■ We believe the number of violators in Unit T–10 was insufficient evidence to support a finding that there had been a *radical* change in the environment and the character of the neighborhood sufficient to make the restrictive covenant obsolete. The trial court erred as a matter of law in finding that the prohibition against mobile homes was no longer enforceable due to a change of conditions. We hold that the first factor weighs heavily in favor of plaintiffs.

### 2. *Relative Adequacy of Injunction:*

In New Mexico, injunctions are granted to prevent irreparable injury for which there is no adequate and complete remedy at law. *Hines Corp. v. City of Albuquerque.* In this case, the trial court concluded plaintiffs had an adequate remedy at law. However, where the character of the property is intact, legal remedies are inadequate, since damages due to loss of quiet enjoyment are incalculable. 43A C.J.S. *Injunctions* § 100 (1978).

■ When enforcing restrictive covenants, a court of equity is to give effect to the intentions of the parties as shown by the language if the instrument is unambiguous and compels execution of the very

thing covenanted to be done. *See id.* Proof of damage is not controlling when injunctive relief is sought to enjoin the breach of a restrictive covenant. *See Jinkins v. City of Jal*, 73 N.M. 173, 386 P.2d 599 (1963). Where one enters into a restrictive covenant and then breaches it, he will be enjoined, irrespective of the amount of damage caused by his breach, and even if there appears to be no particular damage. *Payette Lakes Protective Ass'n v. Lake Reservoir Co.*, 68 Idaho 111, 189 P.2d 1009 (1948). The mere breach affords sufficient grounds for granting an injunction and it is not necessary to prove that the injury will be irreparable. *Id.;* 5 R.P. Powell, *The Law of Real Property* ¶ 676 (1989). We conclude the second *Cunningham* factor does not weigh against plaintiffs in the present case.

### 3. Delay in Bringing Suit:

Defendants also failed to prove the third factor. The delay in bringing suit in the present case was not unreasonable and does not amount to laches or acquiescence by plaintiffs. Mere delay in bringing an action to enforce a restrictive covenant does not, in itself, constitute laches. 43A C.J.S., *supra*, at 151. The evidence must show the delay was unreasonable and that it was this delay that prejudiced defendants. *See, e.g., C & H Constr. & Paving Co. v. Citizens Bank*, 93 N.M. 150, 597 P.2d 1190 (Ct.App.1979); *Apodaca v. Tome Land & Improvement Co. (NSL)*, 91 N.M. 591, 577 P.2d 1237 (1978).

For laches to apply, New Mexico requires that a defendant prove: (1) plaintiff's conduct gave rise to the situation of which complaint was made and for which plaintiff sought a remedy; (2) delay in asserting plaintiff's right after having knowledge or notice of defendant's conduct and having been afforded an opportunity to institute such; (3) lack of knowledge or notice on the part of defendant that plaintiff would assert the right on which the suit was based; and (4) injury or prejudice to the defendant if the lawsuit is not barred. *C & H Constr. & Paving Co. v. Citizens Bank.*

For the defense of laches to arise, there must be delay on the part of the complaining party which results in injury to the defendant. * * *

Dempsey argues that delay on the part of the property owners association began in 1982 when Hudspeth, another property owner and co-defendant * * * installed a mobile home in the subdivision without complaint by the property owners. Dempsey, however, is not entitled to rely for purposes of laches on the Property Owners Association's delay with respect to Hudspeth. * * * [I]t is irrelevant to Dempsey's defense of laches.

To carry his burden, Dempsey must prove the delay by the property owners was unreasonable *in the face of actions taken by Dempsey* himself. [Emphasis added; footnote omitted; citations omitted.]

*Dempsey v. Apache Shores Property Owners Ass'n*, at 596.

The trial court's own findings on laches proved that plaintiffs were not guilty of laches. Although plaintiffs were aware of defendants Grays' mobile home in 1984, they had no knowledge of the violations by the other defendants until immediately before filing their lawsuit. There was no delay in naming the other Unit T–10 mobile home owners as defendants to the lawsuit once it was discovered they, too, were violating the covenants. Defendants Gray are the only defendants who might be protected under the defense of laches.

Filing a lawsuit, however, is not the only action available to plaintiffs. To prevent a bar because of laches, seasonable notice or protest to the defendant *or* other appropriate action is necessary. 3A C.J.S., *supra*, at 151. We believe that plaintiffs took reasonable steps to place defendants on notice when they complained to members of the Architectural Control Committee. It was this committee's duty to enforce the restrictive covenants. Plaintiffs reported the mobile home violations as they discovered them. They did not "sit upon the rights" but assumed TPA and its predecessor would perform their obligation. Once

they learned that TPA was not following up on their complaint, plaintiffs immediately filed suit. We thus hold that laches did not bar plaintiffs' complaint as to any defendant.

The trial court's decision on laches is in error as a matter of law and is not supported by the court's own findings or the evidence presented at trial. Instead, the trial court's findings support the conclusion that plaintiffs did not unreasonably delay in asserting their rights. In summary, the evidence at trial, as reflected in the trial court's own findings, was legally insufficient to support a conclusion of laches as to all defendants. The fact that defendants would suffer if plaintiffs prevailed was not the issue to be decided. The issue was whether defendants had suffered further injury due to a delay in bringing their lawsuit. Again, the third factor favors the granting of plaintiffs' request for injunctive relief.

### 4. *Misconduct of Plaintiffs:*

The next *Cunningham* factor leads to the same result. The record is totally void of any evidence of misconduct by plaintiffs. As we noted above, plaintiffs did not unreasonably delay asserting their legal claim, thus causing additional injury to defendants. Plaintiffs, in compliance with the restrictive covenants for Unit T–10, built a stick cabin rather than transport a mobile home onto their property. Additionally, there is no evidence that plaintiffs made any false or misleading representations to defendants. As a matter of fact, the evidence indicated that plaintiffs never spoke to any of defendants. Plaintiffs have "clean hands" and are not barred by any misconduct from enjoining defendants, who breached known covenants.

### 5. *Interests of Third Parties:*

 New Mexico courts, like most jurisdictions, favor the free enjoyment of one's property without undue restrictions. *See Cain v. Powers; Montoya v. Barreras.* However, when restrictions are unambiguous, they become valuable property rights that run with the land and are strictly

enforced by courts. *See Montoya v. Barreras.* Although defendants have a strong interest in the free use of their land, they bought the land with actual notice of the unambiguous restriction with respect to mobile homes. Defendants acted at their own peril and now cannot be heard to complain of infringement on their rights. For this reason, we conclude, as a matter of law, that the trial court erred in holding that defendants acted in good faith.

The question of whether a defendant is entitled to a good faith immunity to excuse violation of restrictive covenants is a case of first impression in New Mexico. We hold that a good faith defense preventing enforcement of unambiguous covenants requires lack of notice. "Where one takes land with notice of restrictions, equity and good conscience will not permit that person to act in violation thereof, and one seeking to enjoin such a violation is entitled to relief regardless of relative damage." *Gladstone v. Gregory,* 95 Nev. 474, 480, 596 P.2d 491, 495 (1979). At trial, defendants admitted they were familiar with the restrictive covenant prohibiting mobile homes. They had actual notice, and equity will not protect their interest to enjoy their land free of restrictions.

Reliance on misrepresentations by sales persons, covenant summaries, the developer, or TPA/TPOA does not constitute "good faith" or mistake of law defenses. Such defenses have been rejected in other jurisdictions.

Appellants' purported claim of innocence, based upon their explanation that they relied upon the advice of their architect, is unpersuasive. The advice given by the architect, who concluded that appellants' reconstructed house would be in compliance with the terms of the restrictive covenant, by no means constituted a final resolution of the covenant question. And although appellants may have mistakenly relied upon the incorrect advice of their architect, such a mistaken assumption that they were acting legally and properly did not confer immunity upon them from the right of appellees or any other homeowners in the subdivision

to seek, equitable enforcement of the restriction.

*Sandstrom v. Larsen,* 59 Haw. 491, 500, 583 P.2d 971, 978 (1978). *See also Mid–State Equip. Co. v. Bell,* 217 Va. 133, 225 S.E.2d 877 (1976); *Minner v. City of Lynchburg,* 204 Va. 180, 129 S.E.2d 673 (1963). As a matter of law, we conclude defendants are not entitled to protect their property interest, the right to the free use of the land, under a good faith immunity. The fifth factor does not weigh in favor of defendants, who freely entered into land restrictions with notice.

### 6. *Practicability of Enforcing Injunction:*

This factor likewise is not adverse to plaintiffs' requested relief. Here, we have approximately ten mobile homes that must be moved under the injunction. Mobile homes and trailers, unlike commercial buildings or more traditional residences, are movable; in fact, mobile homes and trailers are marketed on the basis of their mobility. Six of the original defendants removed their mobile homes after the lawsuit was filed. Even though defendants may incur some financial costs and inconveniences, an injunction to remove the offending mobile homes does not require either an impossibility or something that is highly impractical.

### 7. *Relative Hardship:*

Finally, the last factor also favors the granting of injunctive relief. We hold that the trial court abused its discretion in balancing the relative hardships between the parties. The neighborhood has not undergone a radical change, and the benefits secured by the covenant are difficult to quantify. The value plaintiffs seek to protect is a value to the community of which they are a part. *Cf. Gaskin v. Harris,* 82 N.M. 336, 481 P.2d 698 (1971) (in absence of a change of condition, covenant containing architectural restriction was enforceable and did not require a balancing of hardships where the relative hardship to the defendant was far outweighed by the benefits to the community affected). The balancing is not just the aggregate loss to all defendants with respect to only plaintiffs, but must take into account the "loss" to all other lot owners. Second, the trial court's finding that defendants, if enjoined, would sustain "substantial economic loss" is not supported by substantial evidence. The measure of damages in balancing the hardships is not the cost of the mobile home or the improvements, but rather the cost to remodel or remove the offending structure in order to comply with the covenant. *See, e.g., Hines Corp. v. City of Albuquerque; Jinkins v. City of Jal.* There was no evidence on the actual cost for removing the offending mobile homes.

The only relevant evidence supporting a finding of economic loss to defendants was the testimony of two defendants regarding present devaluation of their lot. However, we find this testimony to be without merit. There was evidence at trial that the developer has other subdivisions within the development area that expressly allow mobile homes as residences. There was evidence that one defendant had moved his mobile home from Unit T–10 to such a subdivision. If defendants should suffer a loss in any exchange or are unable to exchange lots, they may have a cause of action against those upon whom they may have relied to their detriment. However, even if defendants incur some financial loss, the relative hardship to defendants is far outweighed by the benefits to the community affected. *Gaskin v. Harris.*

Having considered each of the *Cunningham* factors, we hold there was a lack of substantial evidence to support the trial court's findings regarding defendants' affirmative defenses. We thus hold that the trial court abused its discretion in denying plaintiffs' requested relief under the *Cunningham* criteria.

### C. *Default Judgment*

Finally, we address plaintiffs' issue regarding the trial court's failure to enter judgments against any defaulting defendants. Because we conclude that the restrictive covenant at issue is not ambiguous, we hold that plaintiffs are entitled

**490**

upon remand to entry of judgment against all defaulting defendants.

CONCLUSION

In summary, we hold that the restrictive covenant in question was not ambiguous. We thus conclude that the trial court abused its discretion in upholding the affirmative defenses. With respect to defendants Gray, however, we conclude they were exempt from compliance under covenant "H" and that any injunctive relief shall not affect them. We reverse the trial court. We remand for the entry of an order granting the requested declaratory judgment and injunctive relief consistent with this opinion. The parties shall bear their own costs on appeal.

IT IS SO ORDERED.

DONNELLY and MINZNER, JJ., concur.