2003-NMCA-126

78 P.3d 913

**Jim ARAGON, et al., as homeowners in the Vista Land Subdivision, Plaintiffs–Appellants,**

v.

**George F.M. BROWN and Yvette Brown, Defendants–Appellees.**

No. 22,472.

Court of Appeals of New Mexico.

Aug. 28, 2003.

thirty (30) days from the date it is filed, the    motion is automatically denied."

John P. Hays, Kenneth J. Cassutt, Cassutt, Hays & Friedman, P.A., Santa Fe, NM, for Appellants.

James A. Chavez, James A. Chavez, P.C., Albuquerque, NM, for Appellees.

## OPINION

VIGIL, Judge.

{1} This case presents an issue of first impression: whether validly enacted, unambiguous restrictive covenants running with the land (covenants) that do not violate public policy, statutory, or constitutional provisions are subject to a separate requirement of "reasonableness" before they are enforced by injunctive relief. Sixty-seven landowners in the Vista Land Subdivision (Subdivision) filed a complaint for injunctive relief seeking to remove a manufactured home Defendants (the Browns) placed in the Subdivision. The manufactured home violates pre-existing, valid covenants which clearly and unambiguously exclude the Browns' manufactured home. The covenants do not violate public policy, statutory, or constitutional provisions. However, the trial court ruled that insofar as the covenants exclude the Browns' manufactured home, they are "not reasonable and should not, in equity, be enforced" and denied injunctive relief. We hold that the trial court imposed an unnecessary requirement of "reasonableness" to issue an injunction in the circumstances of this case and reverse.

*FACTS*

{2} In 1971 the Vista Land Company established the Subdivision in Santa Fe County, New Mexico, to sell residential lots. The Vista Land Company established and recorded restrictive covenants in a Declaration of Restrictions binding all purchasers and successors in interest. The covenants, in pertinent part, provide that all lots in the Subdivision shall be known and described as residential lots, that only a single-family dwelling and other structures associated with a dwelling may be constructed on the lots, and that "[n]o building shall be erected, placed or altered on any lot of this subdivision that does not conform" to the covenants. The covenants originally stated, "[n]o trailer ... shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence." The lot owners formed the Vista Landowners Association (Association) to enforce the covenants.

{3} The Association always allowed conventional homes which were not built on site, such as those built by Preferred Building Systems (Preferred), if they otherwise complied with the covenants. There are several such homes in the Subdivision, and not all of them were built by Preferred. However, when lot owners attempted to place manufactured homes on their lots, the Association told them manufactured homes were not allowed under the covenants, and asked that the manufactured homes be removed. All complied.

{4} The terminology of trailers versus mobile homes versus manufactured homes started getting confusing. Since the original covenants were binding until January 1, 2000, and automatically extended for successive periods of ten years unless a majority of the lot owners agreed to a change, the Association decided to clarify the covenants on the recommendation of their attorney. The ballot sent to the lot owners with the proposed change states in pertinent part:

> I [We} approve [ ] do not approve [ ] (mark one) the proposed amendment to paragraph E of the Covenants, clarifying that manufactured homes are not permitted in the Subdivision, but offsite conventional homes (such as are built by Preferred Builders) are permitted.

{5} Sixty-six owners voted in favor of the amendment, and five voted against it. As amended, effective January 1, 2000, the covenants at issue read:

> No trailer, trailer house, motor home, mobile home, manufactured home, premanufactured home, modular home or *other non site built home* shall be moved onto or placed upon any lot in the Subdivision for use as a temporary or permanent residence, *regardless of whether such home meets any federal or state standards for construction of such homes,* and regardless of whether such home is placed on a permanent foundation. Notwithstanding the foregoing, conventional homes constructed offsite, similar to those currently sold by Preferred Building Systems in Albuquerque, New Mexico, shall be permitted, provided that the home meets all regulations and standards promulgated by the New Mexico Construction Industries Division for such homes. (Emphasis added.)

{6} Mr. and Mrs. Wilkinson had owned Lot 10–B in the Subdivision for approximately seventeen years. Mrs. Wilkinson served on the board of the Association and held various positions with the Association during the time she owned Lot 10–B. Mr. and Mrs. Wilkinson voted in favor of the amendments to the covenants. On October 13, 2000, the Browns acquired Lot 10–B from the Wilkinsons in a quitclaim deed. Mrs. Brown is the daughter of the Wilkinsons. The Browns had previously lived in the Subdivision in a Preferred home. They knew there were covenants, and they knew Preferred homes complied with the covenants. The Browns called Preferred to purchase a home, but because Preferred was going to take three months to provide a home, and the Browns wanted a home immediately, they decided to buy their home elsewhere. The Browns bought their home in July 2000, before they actually received title to their lot.

{7} When the home was delivered, neighbors immediately complained to the Browns that the home did not comply with the covenants. The president of the Association met with them and their builder and told them the home did not comply. The Association formally demanded that the home be removed, and the Browns refused. This suit to remove the home followed.

{8} The undisputed evidence is that the Browns' home does not meet all regulations and standards promulgated by the New Mexico Construction Industries Division (CID) for such homes, but it is built in conformance with all applicable federal Housing and Urban Development (HUD) regulations for a manufactured home built off-site. The trial court found that federal regulations:

> Are intended to address and meet all local building codes. The match is not perfect and there can arise variances between the HUD standards and any given local building code but, in the main, there is no practical difference between homes built to HUD standards and homes built to New Mexico's standards as set by the State's Construction Industries Division.

Based upon this finding, the trial court concluded, "[t]he Browns' home meets federal building standards which are substantially equivalent to the State's building standards and is functionally the same as the types of homes acceptable under the [covenant] Restrictions." It was on this basis that the trial court concluded that in excluding the Browns' home, the covenants are not reasonable and should not, in equity, be enforced. Plaintiffs appeal, and we reverse.

## STANDARD OF REVIEW

■ {9} The complaint seeks injunctive relief which is directed to the sound discretion of the trial court. *Wilcox v. Timberon Protective Ass'n,* 111 N.M. 478, 485, 806 P.2d 1068, 1075 (Ct.App.1990). However, the trial court abuses discretion when it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law. *See N.M. Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (stating decision premised on a misapprehension of the law may be characterized as an abuse of discretion); *LaBalbo v. Hymes,* 115 N.M. 314, 318, 850 P.2d 1017, 1021 (Ct.App.1993) (stating trial court may abuse its discretion by applying incorrect standard or incorrect substantive law for preliminary injunction). Whether the "reasonableness" of pre-existing, validly enacted, unambiguous covenants that do not violate public policy, statutory, or constitutional provisions may be considered when enforcing such covenants by injunctive relief presents a question of law, which we review de novo. *See Cafeteria Operators, L.P. v. Coronado–Santa Fe Assocs.,* 1998–NMCA–005, ¶ 19, 124 N.M. 440, 952 P.2d 435 (stating injunction left to discretion of trial court so long as consistent with well established standards).

## ANALYSIS

■ {10} *Montoya v. Barreras,* 81 N.M. 749, 751, 473 P.2d 363, 365 (1970), teaches that restrictive covenants have historically been "used to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability." They have allowed the creation of stable arrangements of land use, and because their use is a concomitant right of property ownership, they can be used for any purpose that is not illegal or against public policy. *See generally* Restatement (Third) of Property (Servitudes) § 1.1 cmt. a (2000). Furthermore, "such covenants constitute valuable property rights of the owners of all lots in the tract," *Montoya,* 81 N.M. at 751–52, 473 P.2d at 365–66, and we have repeatedly recognized that reliance on restrictive covenants is a valuable property right. *Wilcox,* 111 N.M. at 485, 806 P.2d at 1075; *see Appel v. Presley Cos.,* 111 N.M. 464, 466, 806 P.2d 1054, 1056 (1991); *Cunningham v. Gross,* 102 N.M. 723, 725, 699 P.2d 1075, 1077 (1985); *see also Gorman v. Boehning,* 55 N.M. 306, 310, 232 P.2d 701, 704 (1951) (stating a restrictive covenant is something of value to all lots in a tract which cannot be divested by a stranger acquiring title adverse to the common owner).

■ {11} In *Montoya,* the Supreme Court recognized that each owner of a lot has a contractual right to have the restrictions enforced against the owner of any other lot. 81 N.M. at 752, 473 P.2d at 366. The reason is that a restrictive covenant is part of the valuable contract consideration given and relied upon in the conveyance of land. *Focus Entm't Int'l, Inc. v. Partridge Greene, Inc.,* 253 Ga.App. 121, 558 S.E.2d 440, 446 (2001); *see also Garden Lakes Cmty. Ass'n, v. Madigan,* 204 Ariz. 238, 62 P.3d 983, 986 (2003) (stating covenants "constitute[ ] a contract between the subdivision's property owners as a whole and the individual lot owners." (internal quotation marks and citation omitted)); *Colandrea v. Wilde Lake Cmty. Ass'n,* 361 Md. 371, 761 A.2d 899, 915 (2000) (stating covenants constitute a contract between landowners and association); *Namleb Corp. v. Garrett,* 149 Md.App. 163, 814 A.2d 585, 591 (2002) (stating a restrictive covenant is contractual in nature). The trial court has a duty to enforce the expressed intentions as set forth in covenants when they are unambiguous. *Wilcox,* 111 N.M. at 484, 806 P.2d at 1074.

{12} The public policy in New Mexico is to uphold the valuable property right of all the lot owners to establish standards they deem appropriate, the concomitant right of all the

lot owners in the subdivision to rely on those standards, and the reciprocal obligation to comply with those standards when one acquires a lot with notice, actual or constructive, of the standards. To determine what those interests are in this case, we look to the language, intent, and history of the covenants.

{13} The covenants begin with an all-inclusive prohibition: no non-site built home may be moved onto or placed upon any lot in the Subdivision, regardless of whether the home complies with any federal or state standards for construction of such a home, and regardless of whether the home is placed on a permanent foundation. There is only one exception: conventional homes similar to those of Preferred provided they meet all state CID regulations and standards. As to intent, the covenants recognize that excluded non-site built homes may be functionally equivalent in certain respects to homes that are allowed. Homes that are placed on a permanent foundation may be functionally equivalent in that respect, as are homes that are built to certain structural tolerances that comply with both state and federal building standards. The covenants intend to exclude non-site built homes regardless of the equivalency if they do not otherwise comply. Finally, the history shows that non-site built conventional homes like Preferred have always been allowed, and other non-site built homes were never allowed.

{14} The covenants make the distinction between state and federal standards material. Why the landowners made the distinction they did is irrelevant. *Wilcox* specifically states, "[t]he secret, unexpressed intentions of the developer [in adopting covenants] are not admissible to interpret the meaning of a covenant running with the land." 111 N.M. at 484, 806 P.2d at 1074.

■ {15} The distinction which the landowners made between federal and state standards is also recognized by the legislature. The Manufactured Housing and Zoning Act, NMSA 1978, §§ 3–21A–1 to –8 (1987, as amended through 2001), states that a zoning ordinance cannot exclude a manufactured home like the Browns' built to HUD standards, from a specific-use district in which

site-built, single-family housing is allowed. §§ 3–21A–2(A), –3. However, the legislature also mandates that nothing in the Act or any ordinance or regulation adopted pursuant thereto, "shall be construed as abrogating or limiting a recorded restrictive covenant or deed restriction." Section 3–21A–6(A). The distinction made by the Subdivision landowners in this case is not contrary to public policy. *Compare Hill v. Community of Damien of Molokai*, 1996–NMSC–008, ¶ 26, 121 N.M. 353, 911 P.2d 861 (finding that if use violated restrictive covenants, such covenants violated the Federal Fair Housing Act).

■ {16} The trial court made a finding that, "[t]here is no claim that the [Browns'] home is unattractive, unsafe *or otherwise not suited to the subdivision.*" (Emphasis added.) This finding is not supported by substantial evidence. Sixty-seven homeowners filed the lawsuit to remove the Browns' home because it does not comply with the covenants, and the undisputed facts establish the home violates the covenants. The Browns' home is "otherwise not suited to the subdivision." The net effect of the trial court's decision is that not only are homes built to CID standards allowed in the Subdivision, homes built to HUD standards are also allowed, in violation of the covenants. This is not permissible. *See Appel,* 111 N.M. at 466, 806 P.2d at 1056 (stating that to permit individual lots to be relieved of covenant burdens destroys right to rely on covenants).

{17} This is not a case in which a developer or committee exercised discretion under covenants to grant a variance to certain lots, *Appel,* or in which a developer reserved the right to approve or disapprove specified uses, *Cypress Gardens, Ltd. v. Platt,* 1998–NMCA–007, ¶ 21, 124 N.M. 472, 952 P.2d 467. In these situations, inquiry into whether the exercise of discretion was "reasonable" is necessary. In contrast, no exercise of discretion is required in this case. The covenants clearly and unambiguously exclude the Browns' home.

■ {18} We hold that a general inquiry into whether restrictive covenants running with the land are reasonable is not a proper inquiry in considering whether to grant an

injunction to enforce such covenants. In doing so we uphold the historical recognition of covenants as valuable property rights, coupled with the duty to enforce the expressed intentions set forth in unambiguous covenants that do not violate public policy.

{19} The discretion of the trial court was premised on a misapprehension of the law and it therefore abused its discretion. *See N.M. Right to Choose/NARAL*, 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450.

*INJUNCTIVE RELIEF IS APPROPRIATE*

■ {20} In considering whether to grant an injunction, New Mexico courts have generally considered a number of factors:

(1) the character of the interest to be protected; (2) the relative adequacy to the plaintiff of an injunction, when compared to other remedies; (3) the delay, if any, in bringing suit; (4) plaintiff's misconduct, if any; (5) the interests of third parties; (6) the practicability of granting and enforcing the order or judgment; and (7) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied.

*Wilcox*, 111 N.M. at 486, 806 P.2d at 1076.

{21} We have already discussed the character of the interest to be protected and the Browns' right to free use of their land when balanced against the restrictions of the covenants, factors (1) and (5). Both weigh in favor of the Association and against the Browns.

{22} The second factor, relative adequacy of an injunction when compared to other remedies, also weighs in favor of the Association. The mere breach of the covenants affords sufficient grounds for granting an injunction because the court is doing nothing more than requiring execution of the very thing covenanted to be done. *Id.* at 486–87, 806 P.2d at 1076–77.

{23} The third and fourth factors, delay if any, in bringing suit, and Plaintiffs' misconduct, if any, also weigh in favor of Plaintiffs. There was no delay or misconduct on the part of the Association.

{24} The final two factors, the practicability of granting and enforcing the order or judgment, and the relative hardship likely to result to the Browns if an injunction is granted and to Plaintiffs if it is denied, also weigh in favor of the Association. Mrs. Brown estimated that the cost to remove the home, including the price of land to put it on, would amount to $25,000 to $30,000. Here, the benefits secured by the covenants are difficult to quantify, and the value the Association seeks to protect is a value to the community of which they are a part. *Id.* at 489, 806 P.2d at 1079; *Cafeteria Operators, L.P.*, 1998–NMCA–005, ¶ 19, 124 N.M. 440, 952 P.2d 435.

{25} We make one final observation. *Wilcox* cites *Gladstone v. Gregory*, 95 Nev. 474, 596 P.2d 491, 495 (1979), to hold that when one takes land with notice of restrictions, equity and good conscience will not permit that person to act in violation of the restrictions. In *Gladstone*, the defendants had constructive notice of the building limitations at issue and after they commenced construction, they received actual notice from the plaintiffs that the proposed building was contrary to the recorded restrictions. *Id.* at 495. The facts here are more compelling. The Browns knew that restrictions existed. They previously had a home which they knew complied with the restrictions and Mrs. Brown's mother was a past member of the board of the Association. The Wilkinsons voted in favor of the amendments before they gave the lot to their daughter and her husband, the Browns. The Browns had actual notice of the restrictions in the covenants and chose to ignore them.

*CONCLUSION*

{26} The *Wilcox* trial court allowed the defendants to keep several nonconforming mobile homes on their lots in violation of the applicable restrictive covenant. We reversed and remanded for entry of an order granting the requested injunctive relief. We likewise do so in this case.

{27} **IT IS SO ORDERED.**

I CONCUR: JONATHAN B. SUTIN, Judge (specially concurring).

MICHAEL D. BUSTAMANTE, Judge (dissenting).

SUTIN, Judge (specially concurring).

{28} I fully concur in Judge Vigil's opinion, but want to provide additional comments.

{29} I agree with Judge Vigil's view that the covenant clearly and unambiguously excludes the Browns' manufactured home, and does not violate any public policy, statute, or constitutional provision. I respectfully do not agree with Judge Bustamante's view, as I understand it, that the finding that no significant difference existed between federal and state construction standards, and the resulting conclusion that the covenant was therefore unreasonable, was tantamount to a determination by the trial court that the covenant violated public policy and was therefore unenforceable.

{30} The very plain language of the covenant, as well as the only reasonable interpretation and understanding of the covenant and the intent of the landowner governing body (the Association) adopting it, is that the type of home the Browns put on the property was not permitted. The Association, a purely democratic institution made up of all landowners, each with a vote, plainly did not want a manufactured home placed on any lot in the Subdivision even if it met federal and state standards for construction. The former covenant and the amended one at issue in this case were consistently enforced for over thirty years to prohibit and exclude manufactured homes.

{31} This is a clear, express, and unambiguous equitable servitude adopted through a democratic process of landowner vote according to procedures set out in a valid governing document. Unless the servitude violates public policy, a statute, or the constitution, the servitude ought to be enforced.

{32} "Restrictive covenants are to be enforced where the clear language, as well as the surrounding circumstances, reveal an intent to restrict land use." *Wilcox v. Timberon Protective Ass'n,* 111 N.M. 478, 484, 806 P.2d 1068, 1074 (Ct.App.1990). Unambiguous restrictive covenants are "valuable property rights that run with the land and are strictly enforced by the courts." *Id.* at 488, 806 P.2d at 1078. There exists no statute or applicable case law in New Mexico that requires invocation of a reasonableness test under these circumstances.

{33} The landowners established a prima facie case for enforcement of the covenant in this case by injunction. I see nothing so patently arbitrary or inequitable about the covenant or the circumstances surrounding its application, or about enforcement of the covenant, that permitted the trial court to ignore or override it. The Browns did not present evidence showing the covenant had no redeeming purpose or value. For example, the Browns did not prove that adoption of the covenant had no valid purpose to maintain the development's aesthetics, conformity, or value, or to reduce costly litigation. The Browns had the burden to present such evidence.

{34} Even were the court to be entitled under the evidence before it to weigh and balance all of the circumstances, in this case, with the evidence before it, and the Browns' failure to rebut the landowners' prima facie case for enforcement of the covenant, I would determine that the strong New Mexico policy favoring the protection of landowners' property rights, including the right to rely on a clear, unambiguous, express equitable servitude contained in a valid governing document, must prevail as a matter of law.

{35} Last, because the issue is the enforceability of the covenant under the facts and circumstances of this case, including the intent of the landowners and the wording of the covenant, it is significant that the Browns had clear notice of the covenant. They understood it. Originally, the Browns decided to place on the property a conventional home, built by Preferred Building Systems, that had specifically been approved and was allowed by the covenant. Instead, the Browns consciously ignored the covenant and placed a different type of home on their property because they felt that waiting a few months was too long to wait for a Preferred home. The Browns lack any equitable ground to bar enforcement of the covenant.

BUSTAMANTE, Judge (dissenting).

{36} I respectfully dissent. The majority refuses to recognize that there can or ought to be any limit on the enforcement of restric-

tive covenants other than statutory, constitutional or (undefined) public policy strictures. I believe there are and should be limits on the scope of private-law devices such as restrictive covenants.

{37} The Restatement (Third) of Property (Servitudes) § 3.1 (1998) recognizes such a limit:

A servitude created as provided in Chapter 2 is valid unless it is illegal or unconstitutional or violates public policy.

Servitudes that are invalid because they violate public policy include, but are not limited to:

(1) servitude that is arbitrary, spiteful, or capricious;

(2) a servitude that unreasonably burdens a fundamental constitutional right;

(3) a servitude that imposes an unreasonable restraint on alienation under § 3.4 or § 3.5;

(4) a servitude that imposes an unreasonable restraint on trade or competition under § 3.6; and

(5) a servitude that is unconscionable under § 3.7.

The provision applicable to this case is subsection (1). In this context the term "unreasonable"-used by the parties and the district court-is synonymous with arbitrary and capricious. The record in this case supports a finding that the covenant distinguishing between New Mexico CID and HUD-regulated homes is "arbitrary" and "capricious."

{38} The trial court considered the deposition testimony of the director of CID and the Manufactured Housing Division of the New Mexico Department of Regulation and Licensing. Viewed in the light most favorable to upholding the trial court's decision, his testimony is that there is no substantive difference between CID and HUD-regulated manufactured homes. The homes are equivalent with regard to safety, longevity, performance, and placement on-site.

{39} The trial court found that there was no substantive difference between the two types of homes. Plaintiffs do not challenge the trial court's finding in this regard. As an appellate court, we must accept finding of facts that are supported by substantial evidence. *Stueber v. Pickard,* 112 N.M. 489, 491, 816 P.2d 1111, 1113 (1991). If there is no difference between the two types of homes, there is no reason for the prohibition of non-CID homes other than pure preference untethered to any reasonable rationale. *See Mulligan v. Panther Valley Prop. Owners Ass'n,* 337 N.J.Super. 293, 766 A.2d 1186 (2001) (imposing reasonableness standard on amendment to covenants); Armand Arabian, *Condos, Cats, and CC & RS: Invasion of the Castle Common,* 23 Pepp. L.Rev. 1 (1995).

{40} Restrictive covenants serve a useful purpose. They have developed into powerful instruments regulating everyday neighborhood life in much of the country. But, their regulatory power must be shown to serve some legitimate purpose—aesthetic, economic, health, and safety interests chief among them. I cannot believe we would enforce, for example, a covenant allowing Pomeranians as pets, but forbidding Pekingese. The Association failed to demonstrate to the trial court any real, much less legitimate, purpose served by excluding homes that are the functional equivalent of homes that are allowed. We should affirm.