1998-NMCA-005

952 P.2d 435

**CAFETERIA OPERATORS, L.P.,**
Plaintiff–Appellee/Cross–
Appellant,

v.

**CORONADO–SANTA FE ASSOCIATES,**
L.P. and A.P. Century II, Defendants–
Appellants/Cross–Appellees.

No. 16726.

Court of Appeals of New Mexico.

Oct. 10, 1997.

Certiorari Denied Dec. 30, 1997.

Kurt A. Sommer, Cheryl Pick Sommer, MacDonnell Gordon, Sommer, Fox, Udall, Othmer, Hardwick & Wise, P.A., Santa Fe, J. Samuel Tenenbaum, Sachnoff & Weaver, Ltd., Chicago, IL, for Plaintiff–Appellee/Cross–Appellant.

Bill Chappell, Jr., Frances C. Bassett, Chappell & Barlow, P.A., Albuquerque, for Defendants–Appellants/Cross–Appellees.

## OPINION

ALARID, Judge.

1. Coronado—Santa Fe Associates (Landlord) appeals and Cafeteria Operators (Tenant) cross-appeals from a district court judgment interpreting provisions of a commercial shopping center lease and awarding money damages and injunctive relief. On appeal, Landlord contends that (1) Tenant should be prohibited from enforcing a "configuration agreement" that was violated when Landlord constructed a building in the shopping center parking lot; (2) imposition of a mandatory injunction to destroy the building was an inappropriate remedy given Tenant's limited commercial leasehold interest; (3) the trial court improperly determined that Landlord overcharged for common area maintenance fees; (4) punitive damages were improperly awarded; and (5) Landlord should have received its proportionate share of attorney's fees and costs for prevailing on the other disputed lease provisions. Landlord abandoned the attorney's fees issue at oral argument. In its cross-appeal, Tenant contends that the lease unambiguously prohibited Landlord from leasing space to another restaurant. Tenant also maintains that it was entitled to costs because it substantially prevailed on its complaint. We affirm on all issues raised in the appeal and the cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

2. Tenant owns and operates Furr's Cafeteria in the Coronado Shopping Center in Santa Fe. In 1983 Tenant's predecessor-in-interest, Furr's Cafeterias, Inc., entered into a lease agreement with Landlord's predecessor-in-interest, Senlic Corporation. The lease contains three provisions central to this appeal; (1) a "configuration agreement" limiting the physical layout of the shopping center to dimensions set forth in an attached schematic; (2) an "exclusivity" or non-compete clause limiting food vendor competition to facilities existing at the time the lease was executed; and (3) an agreement defining "common area maintenance" (CAM) fees. Landlord purchased the shopping center in 1990 and became subject to the terms and conditions of the lease agreement.

3. In June 1990 Landlord indicated to Tenant its desire to construct a building in the corner of the shopping center parking lot, and Tenant agreed to consider a modification of the lease. The parties commenced negotiations, but did not reach an agreement on how the lease should be modified. In 1991 Tenant learned that Landlord intended to construct the building and lease it to Dairy Queen. Tenant filed the present action in September 1991, seeking to enjoin Landlord from constructing a building in violation of the configuration agreement or leasing out space to a food vendor in violation of the exclusivity clause, and requesting money damages for breach of the CAM agreement.

4. While the complaint was pending, Tenant learned that Landlord intended to lease a renovated portion of the shopping center to the Santa Fe Baking Company. The area in question was formerly leased to a restaurant called the "Estrada Room" and to a snack bar, both of which had been operated in conjunction with a bowling alley. In November 1992 Tenant filed an application for a temporary restraining order and for preliminary injunction. A temporary restraining order was issued and a hearing was set on the preliminary injunction.

5. Tenant took the position that the language of the non-compete clause restricted any food vendor facilities to those operated in conjunction with the bowling alley, which had ceased operations shortly after Landlord took control. Landlord claimed that it was much broader, allowing this space to be leased to food vendors irrespective of the existence or non-existence of the bowling alley. The trial court concluded that the clause was ambiguous in that it did not contemplate what would happen if the bowling alley ceased to exist. The trial court construed the ambiguity against the restriction and stated that Tenant could have drafted more precise language if it desired such a restriction. The trial court instructed Landlord's counsel to draft an order denying the application for a preliminary injunction, but there is no indication from the record that this was ever done. In January 1993 the parties requested that the underlying action be continued while they engaged in settlement negotiations, and the matter was continued until further notice. During this period, Tenant amended its original complaint to add the issue addressed in the application for preliminary injunction.

6. In September 1993 Tenant applied for a temporary restraining order and preliminary injunction after discovering that Landlord was about to begin construction of the building that was the subject of their original complaint. A temporary restraining order was issued and a hearing on the preliminary injunction commenced on October 1, 1993. Tenant indicated its willingness to agree to the construction of the building if certain conditions were met. Like the earlier preliminary injunction hearing involving the Santa Fe Baking Company, the trial court seized on the possibility of settlement and encouraged the parties to continue negotiations. The trial court issued an order in January 1994 quashing the temporary restraining order and denying the preliminary injunction on the condition that, on or before construction would begin. Landlord would place a new sign advertising Tenant's business. The trial court indicated that its order would not prejudice the parties' rights with respect to the permanent injunction hearing. On appeal, Landlord relies on Tenant's representations during this hearing to argue that it implicitly agreed to modify the lease.

7. Landlord indicates that it gave the go-ahead for construction based on its belief that it had satisfied most of the conditions identified by Tenant during the preliminary injunction hearing. It claims that it was under the impression that the only matter left unresolved was the issue of attorney's fees and costs claimed by Tenant. Construction began after the January 1994 order denying the preliminary injunction request and was completed in November 1994. The parties dispute whether or not Tenant indicated during construction that it still opposed the building. It appears that the parties continued to negotiate during this period and, unable to reach a settlement, proceeded to trial. Tenant filed a second amended supplemental complaint in March 1995.

8. After a five-day bench trial in May 1995, the trial court entered extensive findings and conclusions. The trial court concluded that the lease unambiguously prohibited the construction of the building. It found that "[Landlord] constructed the new building in the face of objections and following the initiation and continuation of litigation by [Tenant] to enjoin [Landlord] from doing so and knowing that [Landlord] had not established a legal right to construct the new building and had no such right." Finding that damages flowing from the breach were difficult to calculate, the trial court ordered the removal of the building. The trial court further found that the common area maintenance charges were excessive and that this breach of the lease as well as the breach of the configuration agreement constituted outrageous, intentional, and malicious conduct. Based on this conduct, the trial court awarded punitive damages in the amount of $100,000. The trial court also determined that the lease permitted a food services business to occupy the space formerly occupied by the Estrada Room and snack vendors operating in conjunction with the bowling alley. Finally, the trial court ruled that each party should bear its own costs.

## LANDLORD'S APPEAL

### A. Good Faith/Estoppel

9. Landlord does not contend that the building constructed in the parking lot was permitted under the express terms of the lease. Instead, it argues that Tenant's conduct gave rise to two alternative grounds for prohibiting Tenant from enforcing its rights under the lease. First, Landlord contends that Tenant did not act in good faith in conducting negotiations to modify the lease to permit construction in the parking lot. Second, Landlord contends that it detrimentally relied on Tenant's representations and conduct, which led to an implied waiver (what Landlord terms "estoppel by waiver") of any right tenant had to object to the construction.

10. Landlord's arguments are based on Tenant's willingness to negotiate a settlement during the period leading up to construction, and Tenant's purported silence once construction began. Tenant argues that Landlord blurs the distinction between discussions to modify the lease and enforceable promises; Tenant also maintains that its legal challenge to the building preserved its rights and that it continued to communicate to Landlord its objection to the building after construction began.

11. The centerpiece of Landlord's argument is that Tenant's counsel "stipulated" to four settlement conditions at the October 1, 1993 preliminary injunction hearing. At the hearing, the trial court was attempting to get the parties to negotiate and recessed while Tenant's attorney sought authorization from his client. After the recess, Tenant's counsel indicated that his client would settle if: (1) the new building was not leased to another restaurant; (2) Tenant's name appeared on a new pylon sign; (3) they were given additional space and an extended lease; and (4) Tenant was reimbursed for costs and expenses of the suit. Tenant's counsel identified the latter condition as the "hang-up" of the settlement. Landlord's counsel also indicated that the main problem concerned the reimbursement issue. The trial court offered to enter an order reserving the cost issue, but Tenant's counsel indicated that he did not have authority to agree to that. The hearing then ended with an encouragement to settle from the trial court. As indicated above, the trial court then issued an order dissolving the temporary restraining order and denying the application for preliminary

injunction but preserving Tenant's rights to seek a permanent injunction.

### 1. Implied Covenant of Good Faith

■ 12. New Mexico follows the Restatement in recognizing that every contract is governed by an implied covenant of good faith. Restatement (Second) of Contracts § 205 (1981); *see Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990). Our Supreme Court has provided the following definition:

> "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract."

*Planning & Design Solutions v. City of Santa Fe*, 118 N.M. 707, 714, 885 P.2d 628, 635 (1994) (quoting *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852, 856 (1994) (citation omitted)).

■ 13. Landlord does not refer us to any authority for the proposition that the good faith covenant may work to set aside express provisions of an integrated contract. Neither party refers us to *Melnick v. State Farm Mutual Automobile Insurance Co.*, 106 N.M. 726, 731, 749 P.2d 1105, 1110 (1988), where our Supreme Court declined "to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract." Nor will any implied covenant in the contract provide a means of overriding an express provision. *See Continental Potash, Inc. v. Freeport–McMoran, Inc.*, 115 N.M. 690, 704–05, 707, 858 P.2d 66, 80–81, 83 (1993).

14. Landlord relies on *Boss Barbara, Inc. v. Newbill*, 97 N.M. 239, 638 P.2d 1084 (1982). The lease agreement in that case provided that the lessee could not sublet the premises without first obtaining the lessor's written consent. Our Supreme Court held that the provision should be construed to require that the landlord act reasonably and in good faith when withholding consent to a sublease. The lease in this case, however, had no provision authorizing the landlord to change the configuration of the shopping center subject to Tenant's consent. To be sure, Landlord could change the configuration if its tenants consented, but that possibility does not impose on Tenant an obligation to negotiate in good faith regarding a proposed change in the configuration. To expand *Newbill* in such a fashion would be to undermine totally *Melnick* and *Continental Potash*. It is one thing to say that when a lease expressly contemplates certain actions that can be taken only with consent of the other party, then that consent cannot be unreasonably withheld. It is quite another to impose on a party an obligation to negotiate reasonably and in good faith with respect to any change that the other party wishes to make in the contract. We will not make the leap from the first proposition to the second.

15. Landlord additionally argues, however, that the duty of good faith arose during the discussions between Landlord and Tenant regarding possible construction in the parking lot. Landlord contends (1) that Tenant "entered into a preliminary agreement under which it agreed that it would consent to [Landlord's] construction of the building upon [Landlord's] satisfaction of the conditions set by [Tenant]" and (2) that the parties entered into an enforceable "agreement to negotiate in good faith." The problem with this argument is that it was not raised below. We have reviewed Landlord's 236 proposed conclusions of law. None raises this theory. On the contrary, four of Landlord's proposed conclusions rely on an alleged duty of good faith and fair dealing "under the Lease" or "implied in the Lease." We will not consider for the first time on appeal a fact-dependent theory not raised at trial.

### 2. Estoppel

■ 16. Landlord raises the equitable defense of waiver by estoppel. A party may impliedly waive contractual rights through its conduct. *See Brown v. Taylor*, 120 N.M. 302, 305, 901 P.2d 720, 723 (1995). " 'To prove waiver by estoppel the party need only show that he was misled to his prejudice by the conduct of the other party into the honest and reasonable belief that such waiver was intended.' " *Id.* (quoting *J.R. Hale Contract-*

*ing Co. v. United N.M. Bank.* 110 N.M. 712, 717, 799 P.2d 581, 586 (1990)). The party asserting this claim must establish:

(1) the party to be estopped made a misleading representation by conduct;

(2) the party claiming estoppel had an honest and reasonable belief based on the conduct that the party to be estopped would not assert a certain right under the contract; and

(3) the party claiming estoppel acted in reliance on the conduct to its detriment or prejudice.

*Brown,* 120 N.M. at 305–06, 901 P.2d at 723–24.

■ 17. The trial court did not enter a specific finding with respect to estoppel. Instead, it simply found that Landlord constructed the building in the face of continued objections, knowing that it did not have a legal right to do so. The trial court's failure to make findings necessary to establish waiver by estoppel constitutes a ruling against the party with the burden of persuasion on that issue—Landlord. We must affirm if it was rational for the trial court to reject the evidence in support of that theory. *See Lopez v. Adams,* 116 N.M. 757, 758, 867 P.2d 427, 428 (Ct.App.1993). Our review of the evidence establishes that the trial court's determination was rational.

## B. Injunctive Relief

■ 18. Landlord argues that the trial court erred in concluding that the appropriate remedy for the breach was to order the removal of the building. Landlord notes that this case presents an issue of first impression in New Mexico: whether a mandatory injunction ordering the destruction of a building is an appropriate remedy to protect a commercial leasehold interest with only a short term remaining. Landlord relies heavily on the fact that Tenant sought specific performance even though it never really presented evidence that it suffered injury from the breach. The general rule, however, is that a party need not prove damages to enforce a restrictive covenant. *See Wilcox v. Timberon Protective Ass'n,* 111 N.M. 478, 487, 806 P.2d 1068, 1077 (Ct.App.1990). "The mere breach affords sufficient grounds for

granting an injunction and it is not necessary to prove that the injury will be irreparable." *Id.* Although Tenant advocates that breach automatically *requires* injunctive relief, a number of jurisdictions have looked to the equitable principles that come into play when a party is seeking injunctive relief. *See* 9 Richard R. Powell, *Powell on Real Estate* § 60.07 (1997) [hereinafter *Powell on Real Estate* ] ("[S]ome courts have applied the doctrine of relative hardship to deny injunctive relief in a case of a breach of covenant when they found that the damage from the violation was less than the cost of undoing it."). A review of New Mexico case law indicates that our courts have long considered equitable bars to enforcement of property rights. *See Appel v. Presley Cos.,* 111 N.M. 464, 466–67, 806 P.2d 1054, 1056–57 (1991); *Hines Corp. v. City of Albuquerque,* 95 N.M. 311, 313, 621 P.2d 1116, 1118 (1980); *Gaskin v. Harris,* 82 N.M. 336, 338, 481 P.2d 698, 700 (1971); *Heaton v. Miller,* 74 N.M. 148, 154–55, 391 P.2d 653, 657–58 (1964); *Sproles v. McDonald,* 70 N.M. 168, 175, 372 P.2d 122, 126–27 (1962).

■ 19. The restriction in this case is contained in a lease. The modern view is that servitudes may be created by contract. *See* Restatement (Third) of the Law Property (Servitudes) §§ 2.1, 2.2 (Tentative Draft No. 1, 1989) (contract may create servitude). Therefore, we must determine whether contract law and the remedy of injunctive relief has any impact with respect to the appropriate remedy in this case. An injunction may be ordered when the breached obligation was one of forbearance, in this case meaning the duty not to build contrary to the configuration agreement. *See* Restatement, *supra* § 357(2)(a). An injunction is an equitable remedy, left to the sound discretion of the district court so long as the exercise of discretion is consistent with "reasonably well established standards" of fairness and equity. *See* 5A Arthur Linton Corbin, *Corbin on Contracts* § 1136 (1964 & 1997 Pocket Part); *Smith v. McKee,* 116 N.M. 34, 37, 859 P.2d 1061, 1064 (1993); *Hart v. Northeastern N.M. Fair Ass'n,* 58 N.M. 9, 17, 265 P.2d 341, 346 (1953); *Wooley v. Shell Petroleum Corp.,* 39 N.M. 256, 264, 45 P.2d 927, 932 (1935).

Therefore, whether we characterize the issue before us as one sounding in contract or one governed by the law of real property, it is clear that in New Mexico there is no practical effect because we simply look to the general equitable factors to consider whenever injunctive relief is requested. As such, any particularities relating to real property law are only relevant insofar as they need to be addressed when considering these factors, which have been enumerated as follows:

> (1) the character of the interest to be protected; (2) the relative adequacy to the plaintiff of an injunction, when compared to other remedies; (3) the delay, if any, in bringing suit; (4) plaintiff's misconduct, if any; (5) the interests of third parties; (6) the practicability of granting and enforcing the order or judgement; and (7) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied.

*Wilcox*, 111 N.M. at 486, 806 P.2d at 1076; *accord Cunningham v. Gross*, 102 N.M. 723, 726, 699 P.2d 1075, 1078 (1985).

20. In *Wilcox*, some homeowners were attempting to enforce a restrictive covenant barring the use of mobile homes in a subdivision. We reversed the trial court's denial of injunctive relief after engaging in an in-depth analysis of the factors set forth above. 111 N.M. at 486–89, 806 P.2d at 1076–79. The character of the interest to be protected in *Wilcox* was the architectural and aesthetic integrity of the plaintiff's community. *Id.* at 486, 806 P.2d at 1076. Here, Tenant's rights relate to its commercial leasehold interest, and the configuration agreement may be characterized as a negative easement prohibiting construction in the parking lot. *See generally* C.T. Foster, Annotation, *Construction and Operation of Parking–Space Provision in Shopping–Center Lease*, 56 A.L.R.3d 596, §§ 6, 7 (1974). This interest will be extinguished when the lease runs out in 1999. At the time Landlord commenced construction of the unauthorized building, there were over five years remaining on the lease. We have not been able to find any case that upheld removal of structures on the basis of such a short-term interest. *Cf. K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907,

915 (1st Cir.1989) (affirming mandatory injunction ordering removal of building where shopping center tenant's lease might not expire until the year 2023); *West Town Plaza Assocs. Ltd. v. Wal–Mart Stores, Inc.*, 619 So.2d 1290, 1298 (Ala.1993) (involving a shopping center lease, but not a discussion regarding the length of the lease). At oral argument, Tenant made two broad-based public policy arguments with respect to limited duration of its leasehold interest. First, it argued that it would be unfair to penalize it for any diminished interest that has occurred as a result of this case winding its way through the courts. We agree to the extent that the duration of the remaining leasehold interest has decreased during the pendency of this suit. Tenant also argued at oral argument that the broader interest that is being protected here is the right of private parties to be secure in the knowledge that their contracts will be enforced. We also agree that public interest in enforcing contractual rights and obligations must weigh in Tenant's favor. *See Lovelace Clinic v. Murphy*, 76 N.M. 645, 650, 417 P.2d 450, 453–54 (1966); *K–Mart Corp.*, 875 F.2d at 916. Keeping this in mind, however, we believe that courts should focus on the specific interest to be protected in the case. As a practical matter, the short-term commercial leasehold interest at stake in this case must weigh against Tenant to some extent.

21. With respect to the relative adequacy of an injunction when compared to other remedies, there was evidence that the building would restrict visibility from the heavily trafficked intersection at the northwest corner of the shopping mall. The trial court determined that the damages flowing from this would be difficult to calculate, providing Tenant with no adequate remedy at law. Therefore, the harm from the decreased visibility and the difficulty in ascertaining this harm weighed in favor of enforcing the restriction. *See West Town Plaza Assocs. Ltd.*, 619 So.2d at 1298 (visibility from public thoroughfares among factors justifying removal of Blockbuster building constructed in violation of shopping mall tenant's negative easement over parking lot). Another factor which must weigh in Tenant's favor is that it promptly brought suit once it learned that

Landlord intended to breach the configuration agreement. As explained above, the fact that Tenant thereafter attempted to settle the suit should in no way diminish the strength of its case. Likewise, as pointed out in our discussion on estoppel and punitive damages, the fact that the breach was intentional must weigh heavily against Landlord.

22. Turning to the "interests of third parties" factor, the demolition of the building will displace two businesses, Norwest Mortgage and a plumbing supply company. However, both of these businesses entered into the lease with knowledge of this dispute and have been promised indemnification by Landlord for any resulting loss. Under the "practicability of enforcing injunction" factor, *Wilcox* noted that "[m]obile homes and trailers, *unlike commercial buildings* or more traditional residences, are movable." *Wilcox*, 111 N.M. at 489, 806 P.2d at 1079 (emphasis added). Here, of course, the mandatory injunction will require physical demolition and removal of the building. *Wilcox* also noted that in balancing the relative hardships, the entire community of lot owners must be taken into account, not just the plaintiffs. *Id.; see also Gaskin*, 82 N.M. at 338, 481 P.2d at 700 (swimming pool enclosure ordered removed after court determined community's interest in historical architectural integrity far outweighed hardship to defendants). As a practical matter it may not be to the community's advantage to tear down the building. Nevertheless, as noted above, a broader public interest does exist with respect to enforcement of contract rights and obligations.

23. In reviewing these factors as a whole, we cannot say that the trial court abused its discretion in concluding that the balance tipped in favor of enforcing the configuration agreement. Even though we are mindful that the destruction of the building appears to be a disproportionate burden in light of the short-term leasehold interest at stake in this case, we note that "other factors such as acquiescence, laches, or a change in circumstances are usually involved" before equity will bar enforcement of ·a restrictive covenant. *Powell on Real Estate,* supra, ¶ 679[3]. A reasonable view of this case (and one

strongly advocated by Tenant at oral argument) is that Landlord essentially gambled that its breach would ultimately be to its advantage because it would gain additional rent income and force Tenant to agree to a modification of the configuration agreement. Although Landlord has downplayed the significance of the differences between the parties at the time construction commenced, the evidence supports the trial court's determination that "[Landlord] constructed the new building in the face of objections and following the initiation and continuation of litigation by [Tenant] to enjoin [Landlord] from doing so and knowing that [Landlord] had not established a legal right to construct the new building and had no such right." We recognize that it may appear wasteful to require demolition of the building when its benefit to Landlord and others may greatly exceed its detriment to Tenant. But nothing forbids Landlord from negotiating with Tenant to waive its right to compel removal of the building. Although the district court's injunction provides Tenant with a very strong bargaining position, Landlord is hardly entitled to any sympathy, given the district court's finding that Landlord acted in knowing violation of its duties under the lease. We conclude that the trial court acted within· its discretion by refusing to invoke an equitable bar to enforcement.

## C. Common Area Maintenance Charges

24. Under paragraph 5 of the lease, Tenant was obligated to pay its "proportionate share of costs and expenses of maintaining and operating [the common area]," and Landlord was to provide such services on a non-profit basis. The trial court found that Landlord had charged excessive and unjustified common area maintenance charges and awarded damages in the amount of $24,175. The dollar figure is based on Plaintiff's Exhibit 19A, which is a summary of CAM charges compiled by one of Tenant's supervisors, Randy Egenbacher. The trial court also prohibited Landlord from charging a "management fee and/or a profit mark-up at any time in the future as components of its common area maintenance charges." On appeal, Landlord concedes that it improperly

tacked on a 15% surcharge to the CAM fees. Landlord contends, however, that the trial court erred in concluding that it could not pass on its management and insurance costs. Landlord also challenges the trial court's reliance on Exhibit 19A.

## 1. Management Fees/Insurance

25. Landlord interprets the judgment of the trial court to prohibit it from passing on management fees it necessarily incurs as part of its maintenance of the common area, including insurance costs. The trial court's findings and conclusions do not mention insurance, but simply prohibit the Landlord from charging management fees. In explaining the decision, Judge Herrera stated:

as far as the CAM charges, I'm not so sure how this fence cuts. I will order that it be paid on a pro rata basis between all of the tenants. The insurance, I'm not so sure. Again the agreement does provide for public liability insurance. It's not a significant amount. I will direct that that continue to be paid on a pro rata basis. But under no circumstances will I tolerate those management fees being tacked on to this lease when it clearly contemplated they be on a non-profit basis. There will be a refund for the management fees.

Based on this, we do not see why Landlord believes that the trial court's "management fee" prohibition includes insurance costs.

26. We also reject Landlord's argument that it will be forced to maintain the common area at a financial loss. As outlined by Tenant, Landlord had been charging a substantial management fee through a corporate subsidiary called "Kinder Maintenance." A Landlord executive, Bennet Borko, testified that the subsidiary was created to provide consistency and lower maintenance costs. He did not dispute the fact that Kinder Maintenance had been charging Tenant a management fee in addition to the actual costs associated with maintenance. These fees were rather large; for example, Landlord's own statements show that the shopping center as a whole incurred over $44,000 in management fees in 1994, with actual maintenance charges of $140,368.31.

27. In his testimony, Borko conceded that the previous landlord, who had signed the original lease, had simply billed the tenants for the actual costs of the maintenance and did not tack on a management fee. Given the ambiguity of the "non-profit" agreement of the lease, we affirm the trial court's determination that Landlord could only transfer actual costs of the maintenance. Landlord indicated at oral argument that it has now independently contracted out CAM services, thereby simplifying this issue by limiting its own administrative responsibilities with respect to maintenance. We agree with Tenant that Landlord's expenses in overseeing maintenance work performed by others is simply one of the costs of operating the shopping center, and compensated by rents.

## 2. Admission of Exhibit 19A

28. With respect to the reimbursement amount awarded, Landlord makes two points. First, Landlord argues that Randy Egenbacher did not personally prepare the summary and therefore Tenant failed to lay an adequate foundation under Rule 11–1006 NMRA 1997. The Rule simply states that voluminous records may be summarized, subject to inspection by the opposing party. Unlike the business records exception, there is no "qualified witness" requirement. *See* Rule 11–803(F) NMRA 1997. However, courts have read into the Rule a requirement that an individual with knowledge of how the summary was prepared should be available for foundation/cross-examination purposes. *See* 5 Jack B. Weinstein et al., *Weinstein's Evidence* ¶ 1006[06], at 1006–18 (1996); *cf. Archuleta v. Goldman,* 107 N.M. 547, 551–52, 761 P.2d 425, 429–30 (Ct.App.1987) (affirmed use of medical summary in support of summary judgment where affiant had personal knowledge of record summaries). Here, Egenbacher testified that he worked with the subordinate who produced the summary, Jeri Bryce, and that the results were obtained by comparing Landlord's invoices with ledgers supplied by Landlord. The trial court admitted the summary after reading the requirements of Rule 11–1006 and ordering Tenant to make the underlying documents open to inspection. In light of Egenbacher's supervisory role and his knowledge of how the sum-

mary was compiled, we hold that Tenant established an adequate foundation. *See* 5 Weinstein et al., *supra*, at 1006–19; *cf. Central Sec. & Alarm Co. v. Mehler*, 121 N.M. 840, 849–50, 918 P.2d 1340, 1349–50 (Ct.App. 1996) (corporate president who oversaw accountant's bookkeeping was "qualified witness" under business records exception, and challenges to accuracy went to weight rather than admissibility).

■ 29. Landlord also contends that Exhibit 19A includes $12,000 of billed but not paid CAM fees. Exhibit 19A arrives at $24,-169.76 after comparing "CAM Billed" with "CAM Paid." It should be remembered that Landlord is not disputing that Tenant is entitled to reimbursement. As noted, Egenbacher stated that the figures were arrived at by reviewing the itemized billings. Although Landlord claims that Tenant withheld certain payments, the exhibits it refers us to in support of its claim are the ledgers used to compile Exhibit 19A. Landlord has not pointed to any specific document to substantiate its claim that Exhibit 19A is somehow padded by $12,000 .00. Although one of Landlord's witnesses disputed the $24,169.76 figure, the trial judge could properly reject that testimony and rely on the exhibit.

## D. Punitive Damages

■ 30. In a breach-of-contract case, punitive damages "must be predicated on a showing of bad faith, or at least a showing that the breaching party acted with reckless disregard for the interests of the nonbreaching party." *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 210, 880 P.2d 300, 307 (1994). A party acts with reckless disregard when it *"knows* of potential harm to the interests of the plaintiff but nonetheless 'utterly fail[s] to exercise care' to avoid the harm." *Id.* at 211, 880 P.2d at 308. A showing of gross negligence will not suffice. *Id.*

31. Here, the trial court found that Landlord's CAM charges "were intentional, malicious; excessive, unjustified, and unauthorized under the terms of the lease agreement." The trial court found that these charges "involved improper self-dealing and the imposition of an improper and unreason-

able 'profit' charge." The trial court also found that the "violation of the terms of the configuration agreement was outrageous, intentional, wanton, wilful, and malicious." The trial court was particularly incensed by Landlord's decision to go ahead and construct the building in the face of the pending litigation. Landlord argues that, at most, it was grossly negligent in relying on Tenant's representations at the October 1993 preliminary injunction hearing that it was open to settlement. Specifically, Landlord argues that it gave the go-ahead to construction because it believed that the only unresolved issue concerned attorney's fees. Even if this were true, however, Landlord's argument overlooks the magnitude of the attorney's fees dispute. At the October 1993 hearing, Landlord's counsel indicated that this was the major impediment to settlement: "[E]very time we get to that point [agreeing on other conditions], they say, 'Plus, you owe us $90,000,' and we're just not going to do that." In explaining the award of punitives, the trial court characterized Landlord's behavior as a flaunting of the legal process in an attempt to gain a tactical advantage. In light of the pending litigation and Landlord's own concession that a major impediment to settlement still existed, we affirm the trial court's finding that Landlord acted with the requisite culpable mental state in going ahead with construction. Likewise, we defer to the trial court's factual determination that Landlord's profit-making subsidiary was an intentional and malicious end run around the CAM fee provisions of the lease.

## E. Attorney's Fees and Costs

■ 32. Landlord indicated at oral argument that it was abandoning the attorney's fees issue. Landlord's request for costs may be easily dismissed. The trial court did not award costs to either party. Although Tenant maintains that Landlord failed to preserve the issue, it may be more accurate to say that Landlord waived any claim for costs. Landlord raised the issue by way of objection to Tenant's cost bill. Landlord argued that the trial court should deny both parties their costs because there was no prevailing party; in the alternative, Landlord requested that

the court apportion costs equitably. Landlord again requested the trial court to deny costs at the presentment hearing and reassumes its position in its answer brief on the cross-appeal. We therefore affirm Landlord's issue on the ground that it may not complain on appeal about relief that was requested and granted below. *Cf. Cox v. Cox,* 108 N.M. 598, 602–03, 775 P.2d 1315, 1319–20 (Ct.App.1989) (a party may not complain on appeal because the trial court made findings he or she requested).

## TENANT'S CROSS–APPEAL

### A. Exclusivity Clause

33. The exclusivity clause of the lease states:

Lessor will not lease or permit to be leased to any other tenant, subject only to existing facilities being operated in conjunction with Coronado Bowling Center snack bar and dining room and Commonwealth Theaters snack bar, any business building in Coronado Center to be used and occupied for the purpose of operating a cafeteria, restaurant and catering service.

34. New Mexico allows reference to extrinsic evidence to determine whether contractual language is ambiguous. *See Mark V. Inc. v. Mellekas,* 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993); *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 508–09, 817 P.2d 238, 242–43 (1991). If the court determines that a contract is ambiguous, resolution of the ambiguity is an issue of fact. The trial court did not enter a conclusion of law stating that this lease provision is ambiguous. Nevertheless, it necessarily reached this conclusion, because it entered factual findings construing the ambiguity in favor of Landlord's position that the exclusivity clause allowed the relevant space to be leased to a food services business, as opposed to grandfathering in the preexisting businesses only.

35. We affirm the decision of the trial court. First, we agree that the exclusivity clause is ambiguous. It could be read as stating that the only exceptions to the prohibition on food services were the snack bar and dining room operated at the bowling center and the theater snack bar. On the other hand, it would also be reasonable to interpret the references to the bowling center and the theater as being merely descriptive, adding nothing substantive to the exception for "existing facilities." We recognize that the term "existing facilities" could be read as referring only to those specific structures and fixtures in existence at the time of the execution of the lease, but another reasonable interpretation would be broader, encompassing changes to the structure and fixtures that do not prejudice Tenant's interests. (Most restaurants remodel from time to time.) Indeed, when faced with ambiguous restrictions in a lease, it is proper for a court to reach that interpretation that best effectuates the purpose of the restriction while recognizing the public policy against unreasonable restraints on the use of property. *See* Restatement (Third) of the Law Property (Servitudes) (Tentative Draft No. 4 § 4.1(2)(3) and cmt. j, 1994. *Cf. Bowen v. Carlsbad Ins. & Real Estate, Inc.,* 104 N.M. 514, 516 724 P.2d 223, 225 (1986) (discussing reasonableness requirement governing covenant not to compete). The trial court made the following undisputed findings:

27. The Santa Fe Baking Company occupies that portion of the Coronado Shopping Center previously occupied by the snack bar and other dining facilities operated under The Coronado Bowling Center lease.

29. The Estrada Room also operated in conjunction with the Coronado Bowling Center was, at all times relevant hereto, a full-service restaurant.

30. The "Estrada Room," snack bar and other dining facilities were in operation at the time [Tenant] entered into the Lease on June 13, 1983.

31. [Landlord] leased space to Michael Howard, d/b/a The Santa Fe Baking Company, to operate a restaurant and bakery in the space formerly occupied by portions of the Estrada Room, snack bar and other dining facilities.

33. The Santa Fe Baking Company is neither a cafeteria nor a catering service.

34. The Santa Fe Baking Company, as a food services business, does not constitute

a new or different use for the Shopping Center.

35. The Santa Fe Baking Company does not constitute a "new use" or a "different use" for that portion of the shopping center which it occupies.

36. [Tenant] bargained for having another restaurant in the shopping center at the time the Lease was entered into.

37. The Santa Fe Baking Company is not more competition for [Tenant] than was the Estrada Room, snack bar and other dining facility.

38. The customers who frequent the Santa Fe Baking Company are entirely different from the customers who frequent [Tenant].

39. [Tenant] has not demonstrated any loss of business or damages due to the presence of the Santa Fe Baking Company.

44. The Santa Fe Baking Company consists of approximately 1,200 square feet of dining area.

45. The total square footage previously occupied by the "Estrada Room," snack bar, and other dining facilities (which were facilities in existence at the time the June 13, 1983 Lease was executed) was approximately 10,000 square feet.

Given these findings, the trial court could properly rule that Tenant has not suffered any injury from the presence of the Santa Fe Baking Company and is not entitled to an injunction compelling the eviction of the Santa Fe Baking Company.

### B. Costs

 36. Tenant has also challenged the trial court's decision that each party shall bear its own costs. Under Rule 1–054(E) NMRA 1997, there is a presumption that a prevailing party will be awarded costs. *See Marchman v. NCNB Tex. Nat'l Bank*, 120 N.M. 74, 94, 898 P.2d 709, 729 (1995). The decision to award costs is left to the sound discretion of the trial court. *Id.* at 94–95, 898 P.2d at 729–30. A "prevailing party" is one who wins the lawsuit, i.e., a plaintiff who has recovered a judgment or a defendant who has avoided an adverse judgment. *See Dunleavy v. Miller*, 116 N.M. 353, 360, 862

P.2d 1212, 1219 (1993). Tenant argued below and now on appeal that it is the prevailing party because it won on the majority of its claims. Landlord correctly noted below that the biggest issues in the case involved the configuration agreement and the exclusivity clause. In announcing its decision that each party would have to bear its own costs, the trial court emphasized that it was not just relying on the fact that Landlord had prevailed on the exclusivity issue; it also considered the complexity of the case, the issues involved, the legitimacy of some of the disputes, and the fact that Tenant had requested more damages than it ultimately received. In addition, we find it significant that Tenant told the trial court that it could not apportion its costs bill between those issues on which it had prevailed and those on which it had lost. The trial court also noted the similar financial strengths of the parties.

 37. A plaintiff is deemed a prevailing party even if only partially successful. 10 James Wm. Moore, *Moore's Federal Practice* § 54.101[3], at 54–155 (3d ed.1997). Even where a party has prevailed, however, the trial court may exercise its discretion to require that each party bear its own costs. § 54.101[1][a], at 54–148. Although Tenant refers us to cases for the proposition that a plaintiff need not succeed on all claims to justify the shifting of costs, all of the cases relied on by Tenant merely affirm the trial court's discretion to award costs under such circumstances. This is different from saying that a trial court abuses its discretion when it refuses to make such an award. *See* Rule 1–054(E) ("Costs shall be allowed as a matter of course ... *unless the court otherwise directs.*") (emphasis added). In its reply brief, Tenant complains of the trial court's reference to the financial strength of the parties. We agree that a party should not be denied an award of costs simply because it can "afford to swallow" the expense. We do not, however, believe that the district court used wealth as a consideration in awarding costs. The court's reference to the ability of the parties to bear their own costs was made only after the court had recited several reasons for its decision regarding costs. The comment on the parties' wealth was an ob-

servation, not an additional reason. Based on the reasons articulated by the trial court at the presentment hearing, we defer to its ruling.

## CONCLUSION

38. For the reasons set forth above, we affirm on all issues, including the trial court's mandatory injunction ordering the removal of the disputed building.

39. **IT IS SO ORDERED.**

FLORES, J., concurs.

HARTZ, C.J., concurring in part, dissenting in part.

HARTZ, Chief Judge, concurring in part, dissenting in part.

(40) I join Judge Alarid's opinion except for the discussion of punitive damages. On that issue I respectfully dissent. Although some language in decisions by the New Mexico Supreme Court supports the majority's view, I believe that proper analysis of the role of punitive damages in contract cases requires reversal and remand for reconsideration.

(41) I confess to being confused about the state of New Mexico law with regard to awards of punitive damages for intentional breaches of contract. To put the matter in perspective, I will first review what I understand the law to be elsewhere in this country (although I will not discuss punitive damages for breaches of insurance contracts, a subject which receives distinct treatment, apparently because of the fiduciary nature of the relationship between the insurer and the insured).

(42) Longstanding legal tradition in this country finds nothing morally repugnant about intentional breaches of contract. A century ago Oliver Wendell Holmes wrote: "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." Oliver Wendell Holmes, *The Path of The Law*, 10 Harv. L.Rev. 457, 462 (1897). Indeed, modern theory recognizes the potential advantages of contract breaches.

[Holmes's] amoral view is supported by the economic insight that an intentional breach of contract may create a net benefit to society. The efficient breach of contract occurs when the gain to the breaching party exceeds the loss to the party suffering the breach, allowing the movement of resources to their more optimal use. (See Posner, *Economic Analysis of Law* (1986) 107–108.) Contract law must be careful "not to exceed compensatory damages if it doesn't want to deter efficient breaches." (*Id.* at p. 108.)

*Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 431, 433, 900 P.2d 669, 680, 682 (1995) (Mosk, J., concurring and dissenting). "[B]ecause of our notions of efficient breach and the freedom of the marketplace, we have generally not considered an intentional breach tortious." *Id.*, 44 Cal.Rptr.2d at 439, 900 P.2d at 688.

(43) In line with this tradition, intentional breaches ordinarily cannot form the predicate for punitive damages. Not even when the breach is flagrant—when there is no question that the conduct breaches the contract. Not even if the other party will clearly be injured by the breach. Payment of the proper compensatory damages is all that is required.

(44) There have been narrow circumstances, however, in which courts have recognized the appropriateness of punitive damages in a breach-of-contract case. The Restatement (Second) of Contracts § 355 (1981) summarized the state of the law two decades ago as follows: "Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable." For example, an intentional breach accompanied by fraud could justify such an award. *See, e.g., Whitehead v. Allen*, 63 N.M. 63, 313 P.2d 335 (1957) (falsification of weight records by purchaser of alfalfa).

(45) Since the publication of the Restatement, commentators have continued to explore when it is appropriate to impose punitive damages for an intentional breach of contract. One line of inquiry has focused on when economic analysis supports recovery of

more than traditional contract damages. For example, if the breaching party attempts to gain an advantage through dishonesty, the breach serves no economic purpose. The breach is "opportunistic," not efficient, and punitive damages may be useful in deterring such conduct. *See* Barry Perlstein, *Crossing the Contract–Tort Boundary: An Economic Argument for the Imposition of Extracompensatory Damages for Opportunistic Breach of Contract*, 58 Brook. L.Rev. 877, 879–80 (1992).

(46) Nevertheless, further exploration of the issue has not spurred a trend toward expansion of punitive damages for breach of contract. On the contrary, efficient-breach analysis has been a cautionary influence. There has even been some retrenchment. Under an onslaught from critical courts and commentators, a near-unanimous California Supreme Court in 1995 overruled a 1984 decision holding the defendant liable in tort (and therefore subject to punitive damages) for seeking to avoid contractual liability through a bad faith denial that the contract existed. *See Freeman & Mills, Inc.*

(47) How does New Mexico law compare to the law elsewhere? The answer is not clear to me. The results in the New Mexico cases may be consistent with prevailing law elsewhere, but the language of the opinions is not. Perhaps uniquely among American jurisdictions, New Mexico appears to treat every breach of contract as a tort in determining whether to impose punitive damages. As stated in *Romero v. Mervyn's*, 109 N.M. 249, 255, 784 P.2d 992, 998 (1989): "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights."

(48) What does this mean in the context of an intentional breach of contract? Opinions by our Supreme Court say that punitive damages should not be awarded for every intentional breach, *see, e.g., id.* at 256, 784 P.2d at 999—indeed, the Supreme Court has recognized that an efficient breach "may promote the interests of society as a whole,"

*Construction Contracting & Management v. McConnell,* 112 N.M. 371, 375, 815 P.2d 1161, 1165 (1991)—but language elsewhere in the opinions suggests otherwise. For example, after stating that punitive damages can be awarded for a malicious breach of contract, *Romero* states that an act is malicious if "the defendant not only intended to do the act which is ascertained to be wrongful, but [ ] he knew it was wrong when he did it." 109 N.M. at 256, 784 P.2d at 999. Similarly, in *Paiz v. State Farm Fire & Cas. Co.,* 118 N.M. 203, 211, 880 P.2d 300, 308 (1994), the Court wrote:

A mental state sufficient to support an award of punitive damages will exist when the defendant acts with "reckless disregard" for the rights of the plaintiff—i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless "utterly fail[s] to exercise care" to avoid the harm.

It seems to me that virtually every intentional breach of contract would satisfy the above requirements. The breaching party knows that the breach is contrary to the contract rights of the other party and that the other party will suffer injury as a result of the breach.

(49) One possible resolution of the puzzle derives from a qualification that appears in *Romero.* That opinion distinguishes " 'wrongful' breaches of contract from those committed intentionally for legitimate business reasons." *Romero,* 109 N.M. at 256, 784 P.2d at 999. Yet, this distinction raises questions of its own. What business reasons are "legitimate"? If any effort to increase profits is legitimate, then punitive damages would almost never be appropriate. On the other hand, if "legitimate" has a narrower meaning, what is that meaning? Perhaps one could interpret "legitimate" as "non-tortious," in which case New Mexico law follows Section 355 of the Restatement. I would so interpret New Mexico law, but it would be helpful if the Supreme Court were explicit on this point.

(50) Turning to the present case, I first address Landlord's breach of the configuration agreement. The district court found that the violation "was outrageous, intention-

al, wanton, wilful, and malicious." As far as I can tell, however, this finding was based solely on the breach being blatant and intentional. Although the district court orally stated that Landlord constructed the building in the parking lot to "take an unfair tactical advantage in the litigation," I fail to understand how that was so. It seems to me that Landlord placed itself in a much more vulnerable negotiating position by constructing the building without the prior consent of Tenant. I would reverse the award of punitive damages to the extent that it is predicated on breach of the configuration agreement and remand to the district court to enter further findings and conclusions with respect to whether Landlord's breach of the configuration agreement was tortious.

(51) As for the breach of the CAM provisions, that breach may well have been tortious. There was evidence that Landlord engaged in a fraudulent attempt to conceal a management fee. But the district court made no finding to that effect in awarding punitive damages, so remand for further findings is also necessary on this issue.