2005-NMCA-025

108 P.3d 525

**Mondy LEIGH and Sylvia Leigh,**
**Plaintiffs–Appellees,**

v.

**VILLAGE OF LOS LUNAS,**
**Defendant–Appellant.**

Nos. 23,674, 23,731.

Court of Appeals of New Mexico.

Aug. 11, 2004.

Nicholas R. Gentry, Law Offices of Nicholas R. Gentry, L.L.C., J. Brent Ricks, Albuquerque, for Appellees.

Stephen S. Hamilton, Montgomery and Andrews, P.A., Santa Fe, Laurence P. Guggino, Jr., Los Lunas, for Appellant.

## OPINION

CASTILLO, Judge.

{1} In this case, we are asked to decide if restrictive covenants are considered property for purposes of eminent domain. Specifically, the question before this Court is whether Defendant Village of Los Lunas (Village) must compensate Plaintiffs Mondy Leigh and Sylvia Leigh (Leighs), owners of Tract 2 in a subdivision, based on the Village's construction of a drainage pond on Tract 1 in violation of the restrictive covenants imposed on both properties. The Village additionally argues that the district court erred by admitting an appraiser's report and challenges the sufficiency of the evidence for the damages award. We hold that the government is required to compensate for the diminution in value of the property benefitted by the restrictive covenants. We agree with the Village that the award was unsupported by the evidence; we therefore reverse the district court's judgment and remand for recalculation of damages in accordance with this opinion.

## I. BACKGROUND

{2} In 1995, the Leighs purchased Tract 2 for $21,000. Tract 2 is a lot in a subdivi-

sion containing five lots, all of which are subject to covenants restricting use of the land to residential purposes. There is no dispute that the restrictive covenants are valid and run with the land of all lots in the subdivision. The Village acquired Tract 1 for $30,000 for the purpose of constructing a storm drainage pond. The subdivision is located outside the Village, but it is undisputed that the Village may condemn property outside its boundaries "to protect its inhabitants from damage by flood waters." Tract 1 is adjacent to the Leighs' Tract 2. On September 26, 2000, the Village began construction of a storm drainage pond on Tract 1; the pond was substantially completed by February 14, 2001. No part of the storm drainage pond was built on the Leighs' Tract 2.

{3} On January 19, 2001, the Leighs filed an action for damages against the Village, claiming breach of restrictive covenants, inverse condemnation, and trespass. The jury trial was limited to the breach of restrictive covenants and inverse condemnation claims. At the close of the Leighs' case, the Village moved for judgment on the breach of restrictive covenants claim on the ground that inverse condemnation was the Leighs' exclusive remedy; the motion was granted. Following trial, the district court entered judgment against the Village, awarding the Leighs $50,000 in inverse condemnation damages for the diminution in the value of their land caused by the Village's violation of the restrictive covenants. The Village appealed this judgment and filed a motion for judgment notwithstanding verdict (JNOV), remittitur, or new trial. The district court denied the Village's motion, and the Village appealed that order as well. The Village's two appeals were consolidated under case number 23,674.

## II. DISCUSSION

{4} This case relates to the power of eminent domain, under which a government may take or damage private property. *City of Sunland Park v. Santa Teresa Servs. Co.,* 2003–NMCA–106, ¶ 43, 134 N.M. 243, 75 P.3d 843. This power is limited by the constitutional requirement that just compensation be paid to the owner of the property. *Id.; see*

*also* N.M. Const. art. II, § 20; NMSA 1978, §§ 42A–1–1 to –33 (1981, as amended through 2001) (setting forth the procedure for condemnation). The usual procedure is for the appropriate governmental entity to condemn property it wishes to put to public use. *See* § 42A–1–2(C). When a property owner believes property has been taken or damaged by the government but no condemnation petition has been filed, the property owner may institute an inverse condemnation action against the condemnor for taking or damaging the property. *See* § 42A–1–29. The Leighs proceeded in their claim against the Village under this inverse condemnation provision.

### A. Restrictive Covenant as a Compensable Property Right

{5} Article II, Section 20, of the New Mexico Constitution mandates that "[p]rivate property shall not be taken or damaged for public use without just compensation." Whether the taking of a restrictive covenant falls within the constitution's mandate presents a purely legal issue. As such, we review it de novo on appeal. *See Fed. Express Corp. v. Abeyta,* 2004–NMCA–011, ¶ 2, 135 N.M. 37, 84 P.3d 85 (stating that legal issues are reviewed de novo).

{6} The subdivision in question is known as the "Lands of Jayson Epstein," Epstein being the owner who established and recorded restrictive covenants binding on all purchasers of his land and on their successors in interest. The portion of the covenant at issue specifies that "[n]o lot shall be used except for residential purposes." The Village constructed a storm drainage pond on the lot but nevertheless asserts that the use of property by a public entity in contravention of a restrictive covenant does not result in a compensable taking under the New Mexico Constitution.

{7} Restrictive covenants are sometimes described as equitable easements or negative easements. *Montoya v. Barreras,* 81 N.M. 749, 751, 473 P.2d 363, 365 (1970) (stating that restrictions on the use of land are mutual, reciprocal, equitable easements in the nature of servitudes); Restatement (Third) of Prop.: Servitudes § 1.3 cmt. c, at

25 (2000) (referring to restrictive covenants as negative easements). It is well established in New Mexico that restrictive covenants in a subdivision's general plan convey property rights in the lots burdened by the covenant. *See Cunningham v. Gross,* 102 N.M. 723, 725, 699 P.2d 1075, 1077 (1985) (stating that restrictive covenants "constitute valuable property rights of all lot owners therein"); *Montoya,* 81 N.M. at 751–52, 473 P.2d at 365–66 ("Where the covenants manifest a general plan of restriction to residential purposes, such covenants constitute valuable property rights of the owners of all lots in the tract."); *Gorman v. Boehning,* 55 N.M. 306, 310, 232 P.2d 701, 704 (1951) ("A restrictive covenant is something of value to all lots in a tract ...."); *Aragon v. Brown,* 2003–NMCA–126, ¶ 10, 134 N.M. 459, 78 P.3d 913 ("[W]e have repeatedly recognized that reliance on restrictive covenants is a valuable property right."); *Wilcox v. Timberon Protective Ass'n,* 111 N.M. 478, 485, 806 P.2d 1068, 1075 (Ct.App.1990) ("Restrictive covenants ... constitute valuable property rights for *all* lot owners within the restricted area."). The purpose of a subdivision's general plan of restrictions is "to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability." *Montoya,* 81 N.M. at 751, 473 P.2d at 365.

▮ {8} Without question, easements constitute valuable property rights, and their taking requires compensation. *See, e.g., Yates Petroleum Corp. v. Kennedy,* 108 N.M. 564, 567–68, 775 P.2d 1281, 1284–85 (1989) (determining proper compensation for the partial condemnation of private property for an easement); 2 Julius L. Sackman, *Nichols on Eminent Domain* § 5.07[2][b], at 5–354–57 (3d ed., rev.vol.2004) [hereinafter Sackman]. Given New Mexico's determination that restrictive covenants, as equitable easements, also constitute property rights, we conclude that the covenants are protected by Article II, Section 20, of our state's constitution. *See S. Cal. Edison Co. v. Bourgerie,* 9 Cal.3d 169, 107 Cal.Rptr. 76, 507 P.2d 964, 965 (1973) (en banc) (concluding that "a building restriction constitutes 'property' within the meaning of [the state constitution's Takings Clause], and compensation

must be paid whenever damage to a landowner results from a violation of the restriction"); *Hartford Nat'l Bank & Trust Co. v. Redevelopment Agency of Bristol,* 164 Conn. 337, 321 A.2d 469, 471–72 (1973) (reiterating that restrictive covenants are in the nature of equitable easements in the land restricted and that when the restricted land is taken, "the owner of the property for whose benefit the restriction is imposed is entitled to compensation"); *Dible v. City of Lafayette,* 713 N.E.2d 269, 274 (Ind.1999) (concluding that restrictive covenants are property rights in the lots restricted and that the owners of those property rights must be compensated when the government condemns a restricted lot for public use); *Horst v. Hous. Auth. of Scotts Bluff,* 184 Neb. 215, 166 N.W.2d 119, 121 (1969) (same); *Meredith v. Washoe County Sch. Dist.,* 84 Nev. 15, 435 P.2d 750, 752 (1968) (same); *see also* Restatement (Third) of Prop.: Servitudes § 7.8 cmt. a, at 381 (2000) ("Servitude benefits like other interests in property may be condemned under the power of eminent domain and taken by inverse condemnation.") and reporter's note, at 383 ("[I]n this Restatement, all servitude benefits are treated as property rights and thus should be entitled to the protection of the Takings Clause.").

{9} We recognize that there is a split among jurisdictions on the question of whether restrictive covenants are protected property interests: jurisdictions, including those cited above, that consider restrictive covenants to be equitable easements and compensable property interests reflect the "majority view"; jurisdictions that insist the covenants do not convey property rights, thus refusing compensation, reflect the "minority view." *See* Sackman, *supra* § 5.07[4][a], [b], at 5–378–83 (discussing both views and collecting cases); *see also* Restatement, *supra* § 7.8, reporter's note, at 383 (noting that it is "generally accepted" that the benefits of restrictive covenants are protected property rights, "although there are some jurisdictions that treat covenant benefits as non-compensable interests"); R.E. Barber, Annotation, *Eminent Domain: Restrictive Covenant or Right to Enforcement Thereof as Compensable Property Right,* 4 A.L.R.3d 1137, 1151–60

(1965) (discussing cases permitting compensation for the violation of building restrictions under the power of eminent domain, as well as cases denying such compensation).

{10} The essence of the minority view is (1) that restrictive covenants are not property entitled to eminent domain protection but are merely contractual rights, (2) that it is against public policy to restrict the government's eminent domain power through private agreements, and (3) that to require compensation would create undue financial burden for the public. *See, e.g., United States v. Certain Lands in Jamestown*, 112 F. 622, 628–29 (C.C.D.R.I.1899); *Burma Hills Dev. Co. v. Marr*, 285 Ala. 141, 229 So.2d 776, 781–82 (1969); *Smith v. Clifton Sanitation Dist.*, 134 Colo. 116, 300 P.2d 548, 550 (1956) (en banc); *Bd. of Pub. Instruction v. Town of Bay Harbor Islands*, 81 So.2d 637, 642 (Fla.1955); *Anderson v. Lynch*, 188 Ga. 154, 3 S.E.2d 85, 89 (1939). The Village looks to these minority view jurisdictions for support.

■ {11} We find the Village's reliance on the minority view cases unpersuasive. First, as we have already stated, restrictive covenants are deemed property interests in New Mexico. Thus, the question of whether the covenants convey mere contract rights has already been decided. *See Montoya*, 81 N.M. at 751–52, 473 P.2d at 365–66. Second, we are unable to conclude that private agreements restrict the government's eminent domain power. The agreements do afford the owners of private property benefitted by restrictive covenants the ability to be compensated for damages when the government exercises its power. But being able to obtain compensation for the government's violation of a restrictive covenant does not entail the ability to enforce the covenant against the government. *See Town of Stamford v. Vuono*, 108 Conn. 359, 143 A. 245, 249 (1928) (pointing out the clear distinction between the rights of the private landowner, who may be restrained from violating the restrictive covenant, and the rights of the government, which may not be restrained but must make compensation for the violation); Richard I. Brickman, *The Compensability of Restrictive Covenants in Eminent Domain*, 13 U. Fla.

L.Rev. 147, 163–64 (1960) (stating that the weakness of the minority argument is the minority's inability to make the distinction between obtaining an injunction to prevent the violation of a restrictive covenant and obtaining compensation for the violation).

{12} The minority's third argument concerns costs, particularly pertinent in a large subdivision where restrictive covenants provide all lot owners with property rights in the lot condemned. Minority jurisdictions suggest that compensating these numerous lot owners for the government's violation of the restrictive covenant would be an intolerable burden on the public. *See, e.g., Town of Bay Harbor Islands*, 81 So.2d at 643–44; *Anderson*, 3 S.E.2d at 88–89. As we will now explain, we are not persuaded that an intolerable burden will result.

■ {13} We stated earlier that restrictive covenants are characterized as equitable easements in the lots burdened by the covenant. *See, e.g., Montoya*, 81 N.M. at 751–52, 473 P.2d at 365–66. Damages for the partial taking of property by an easement are measured as the difference between the fair market value before and after the taking. *See Yates Petroleum Corp.*, 108 N.M. at 567, 775 P.2d at 1284. This measurement is known as the before and after rule. *See Bd. of County Comm'rs v. Harris*, 69 N.M. 315, 318, 366 P.2d 710, 712 (1961) (stating that the before and after rule entitles a property owner "to recover as compensation the amount the fair market value of [the owner's] property is depreciated by the taking"). Similarly, majority jurisdictions use the before and after rule in measuring the value of a restrictive covenant; specifically, the value is the difference between the fair market value of the lot benefitted by the restrictive covenant immediately before the taking and the value of the lot immediately after the taking. *See* Sackman, *supra* § 5.07[4][a], at 5–380 (discussing majority view, citing to *United States v. Certain Land in Augusta*, 220 F.Supp. 696, 701 (S.D.Me.1963), and stating that "[h]olders of the dominant estate are entitled to be compensated for the diminution in the value of their lots as a result of the extinguishment of the equitable servitude"). The purpose of a before and after valuation is to

ensure that just compensation is provided for the diminution in value caused by the taking; the "before" value is calculated as if there were no taking, and the "after" value is calculated as if the taking had already occurred. *City of Albuquerque v. Westland Dev. Co.,* 121 N.M. 144, 148, 909 P.2d 25, 29 (Ct.App.1995).

■ {14} We emphasize that the before and after rule requires that a claimant prove a decline in the value of the claimant's land caused by the taking. *See id.; Vuono,* 143 A. at 250 (stating that the lot owner is entitled only to the actual depreciation in the value of her property resulting from the loss of the building restriction on adjacent property taken for public use). Consequently, as the *Bourgerie* court observed, the public use to which some condemned lots are put would likely injure only those landowners immediately adjoining or in close proximity to the lot taken; the public use of other condemned lots may result in only negligible damages to other lot owners, regardless of the distance from the condemned lot. *Bourgerie,* 107 Cal. Rptr. 76, 507 P.2d at 968 (remarking that a fire station may result in more damages than a public park, for example); *see also* Brickman, *supra,* at 168 ("As the distance of the claimant's lot from the invaded tract increased, the amount of compensation would rapidly diminish soon to the vanishing point." (internal quotation marks and citation omitted)).

■ {15} The Village additionally insists that the Leighs are not entitled to eminent domain damages because the Leighs failed to meet the requirement under the damages clause of Article II, Section 20: that a property owner's injury be different in kind from the injury suffered by the general public. *See* N.M. Const. art. II, § 20 (covering property taken "or damaged" for public use); *Estate and Heirs of Sanchez v. County of Bernalillo,* 120 N.M. 395, 399, 902 P.2d 550, 554 (1995) (holding that any damage to the plaintiff from zoning regulations was no different from damage to the general public and was therefore not compensable); *Pub. Serv. Co. of N.M. v. Catron,* 98 N.M. 134, 136, 646 P.2d 561, 563 (1982) (concluding that to be compensable, the damage must affect some right or interest and be "different in kind, not merely in degree, from that suffered by the public in general").

{16} We recognize that both the Leighs and the Village discuss the purchase of Tract 1 and the destruction of the Leighs' property interest in the tract in terms of a damage to property, not a taking. Indeed, the Leighs insist that the requirement for the damages clause was met. Damages from the violation of the covenants, the Leighs state, were different in kind from any damages to the public, since only the lots in the subdivision shared the restrictive covenants. We need not decide whether the Leighs are correct in their statement because we do not agree with the parties that the damages clause of Article II, Section 20, is implicated in this case. When the Village took Tract 1 for public use, it also took the Leighs' property interest in enforcing the restrictive covenants as to that tract. The Leighs' interest was not merely damaged; it was extinguished. Indeed, the jury was instructed that any damage award would result from the Leighs' "inability to enforce their restrictive covenants." Because the Leighs completely lost their property interest in Tract 1, we conclude that the Village took the Leighs' interest. *See Aragon & McCoy v. Albuquerque Nat'l Bank,* 99 N.M. 420, 424, 659 P.2d 306, 310 (1983) (stating that a "taking" occurs when all beneficial use of property is lost).

■ {17} The Village also claims that the only damages complained of resulted from the Leighs' proximity to the drainage pond and so are not compensable. *See Aguayo v. Village of Chama,* 79 N.M. 729, 730, 449 P.2d 331, 332 (1969) (concluding that the property owners' mere proximity to a sewage treatment plant does not give rise to compensation, unless the plant is a nuisance per se). The Leighs acknowledge that there was a great deal of testimony at trial about the negative characteristics of the drainage pond, which was adjacent to their property; they stress, however, that the evidence was introduced to respond to the Village's position at trial that the pond had, in fact, a residential purpose. The jury, by special verdict, disagreed with the Village's position, and the Village does not challenge that por-

tion of the verdict on appeal. We cannot conclude, as the Village does, that the evidence introduced means that the damages to the Leighs were only based on their proximity to the pond. Indeed, the Village offered no objection to the jury instruction directing the jury that it was "not to consider awarding damages due to the proximity of the ponding area to [the Leighs'] property." We consequently find the Village's claim without merit and turn to the issue of the damage award given.

## B. Evidence for the Leighs' Damages Award

{18} We determined above that the proper calculation of damages for the taking of a restrictive covenant is the difference between the fair market value of the property benefitted by the covenant immediately before and immediately after the taking. *See Vuono,* 143 A. at 249. The jury was properly instructed on the before and after rule and was told that the Leighs were "only to be awarded damages, if any, for the diminution in the value of their property" resulting from the drainage pond. The jury awarded the Leighs $50,000 in damages.

■■■ {19} The Village disputes the adequacy of the evidence for the award. Specifically, the Village asserts that the district court erred in admitting the report of the Leighs' appraiser because it was not a proper before and after appraisal. The Village also challenges the competency of the Leighs' testimony—which, according to the Village, did not present the fair market value of their property. The standard of review for the admission of evidence is abuse of discretion. *Hourigan v. Cassidy,* 2001–NMCA–085, ¶ 21, 131 N.M. 141, 33 P.3d 891. However, even if erroneously admitted, the evidence complained of must be prejudicial for this Court to reverse. *Id.* Error in admitting evidence is not prejudicial if there is other admissible evidence that substantially supports the verdict. *Stephenson v. Dale Bellamah Land Co.,* 80 N.M. 732, 733, 460 P.2d 807, 808 (1969). We review the competency of evidence under a de novo standard. *See Dick v. City of Portales,* 118 N.M. 541, 544, 883 P.2d 127, 130 (1994).

{20} The Village does not dispute its failure to object to the appraiser's testimony; the only objection was to the admission of the report immediately following the appraiser's testimony. Again, the Village's objection to the report was based on its lack of a before and after appraisal. The Village does contest the Leighs' assertion that any error in the court's admission of the report was cumulative and therefore harmless. *See Leithead v. City of Santa Fe,* 1997–NMCA–041, ¶ 31, 123 N.M. 353, 940 P.2d 459 (reiterating that the erroneous admission of evidence that was merely cumulative of separate, substantial evidence is harmless). The Leighs also challenge the preservation of the Village's objection to their own testimony. We review the Leighs' testimony and the appraiser's testimony to determine if they provide substantive evidence that would render the report cumulative; we therefore need not address the preservation arguments.

■■ {21} We agree with the Village that the court abused its discretion by admitting the report into evidence because the report failed to use the proper method of appraisal: the before and after rule. *See Yates Petroleum Corp.,* 108 N.M. at 567–68, 775 P.2d at 1284–85. The report stated that its purpose was "to determine the current market value of the [Leighs'] property ... and the effect on marketability the storage pond has on the [Leighs'] property." To that end, the report stated that the appraised value of the property on a single day, June 29, 2001, was $60,000 without the pond and $0 with the pond.

■■ {22} The Leighs suggest that the values of their property " 'without the pond and with the pond' " as opposed to " 'before the pond and after the pond' " appear to be a difference in semantics. The "with and without" terminology used by the Leighs' appraiser is not a serious problem if the method used actually calculated before and after values. *See State v. Doyle,* 735 P.2d 733, 737 (Alaska 1987) (determining that the method used by the appraisers, " 'inside-outside,' " in fact calculated the before and after values of the property).

**{23}** In this case, however, we cannot conclude that the appraiser used a before and after calculation. Indeed, the appraiser who authored the report testified at trial that she had not done an appraisal of the property before and after the taking. She acknowledged that such an appraisal was required in a condemnation proceeding but said the Leighs had not asked her to do this type of appraisal. Instead, she was asked to determine the market value of the Leighs' lot on the effective date of the appraisal, which was after the installation of the pond, and to determine what effect the pond and the violation of the restrictive covenant had on the lot. Her $60,000 appraisal of the fair market value of the Leighs' property without the pond was based on sales of four comparable properties. Comparable sales may be considered in determining the fair market value of property condemned. *See* UJI 13–717 NMRA 2004; *State ex rel. State Highway Comm'n v. Bassett*, 81 N.M. 345, 346–47, 467 P.2d 11, 12–13 (1970).

**{24}** The appraisal of the worth of the property after the pond, however, seems to have been based on the health and safety concerns with the presence of the pond, including the pond's attractive nuisance to small children and the possible infestation of flies, mosquitoes, and snakes, as well as the pond's odors. The appraiser quoted the addendum of her report, which states, "It appears that the [$60,000] value of this lot has been negated by the actions of an external party." She interpreted that statement to mean the lot was worth $60,000 without the pond and nothing with the pond. We find no attempt to assess the property's fair market value with the pond. The appraiser did not, for example, compare the value of lots next to drainage ponds. There is no suggestion that such comparables are unobtainable; apparently, at least three of the approximately thirty-eight drainage ponds in thirty-one area subdivisions have standing water on a regular basis. We note that the Village's appraiser, after comparing the market values of similar lots adjoining drainage ponds and those not adjoining drainage ponds, reported that the Leighs' property suffered no diminution in value from the construction of the drainage pond. We disagree, therefore, with

the Leighs' assumption on appeal, contrary to their appraiser's own trial testimony, that the report's "with and without" the pond calculation is the same as a before and after valuation. We find the report's admission in error. Since the appraiser testified to the contents of her report, we disagree with the Leighs that the appraiser's trial testimony constituted separate and substantial evidence that would render the inadmissible report cumulative.

**{25}** The only other testimony offered as to valuation was the Leighs' own testimony. A landowner may offer testimony as to the value of the property. UJI 13–716 NMRA 2004; *State ex rel. State Highway Comm'n v. Chavez*, 80 N.M. 394, 396–97, 456 P.2d 868, 870–71 (1969). However, the testimony must be directed to the fair market value. UJI 13–716. The fair market value is what a willing seller would take and a willing buyer would offer for the property if it were put on the open market. *See* UJI 13–711 NMRA 2004; *see also El Paso Elec. Co. v. Pinkerton*, 96 N.M. 473, 474, 632 P.2d 350, 351 (1981). Our review of the testimony leads us to conclude that the Leighs did not testify as to fair market value; they testified to the lot's value to them personally.

**{26}** Ms. Leigh testified that the value "to us was about $60,000" and that the land now, as a hazard and nuisance, "is worthless to us." On cross-examination, she explained that the basis for the $60,000 figure was the amount of time the Leighs expended in finding the perfect property and its suitability to them for building a home. In contrast, later in the cross-examination, she acknowledged that the value of the property as an investment was $30,000. Similarly, Mr. Leigh testified that in his opinion, the value of his property prior to the construction of the pond was priceless "[t]o me," and the land after the construction was useless "[t]o me." He stated that he was not a market analyst and would have to depend on the appraisal done in that point of time but was willing to sell the property for $50,000. He also testified that he currently had Tract 2 on the market for $26,000 but would not want to sell it for less than $21,000. He stated that the property did have residual value after the

**128**

construction of the pond but that "[its value] depends on what I get out of it in the market." We do not find this sufficient evidence for the verdict.

{27} Neither the Leighs' testimony nor their appraiser's testimony provided sufficient evidence of the before and after fair market values of the property. We therefore find the erroneous admission of the appraiser's report to be reversible error. *See Roberson v. Bd. of Educ. of Santa Fe,* 80 N.M. 672, 676, 459 P.2d 834, 838 (1969) (affirming the district court's reversal of the board's decision for lack of substantial support in the record, absent the inadmissible evidence). We remand for recalculation of the Leighs' property before and after the taking in accordance with this opinion.

{28} We address one other related matter: the apparent dispute over the date of the taking. The parties stipulated that the Village began construction of the pond on September 26, 2000. The Village assumed the Leighs meant for this date to be the date of the taking. On appeal, the Leighs remark that the exact date of the appraisal does not appear to be critical, and they suggest that the stipulated date of the pond's substantial completion, February 14, 2001, is the "more logical date of 'taking or damaging.'"

{29} Section 42A–1–29 requires that the value of property taken under eminent domain be "at the time the property is or was taken." *See State Highway Comm'n v. Grenko,* 80 N.M. 691, 693, 460 P.2d 56, 58 (1969) (stating that real estate values are not constant and that the New Mexico statute in effect at the time, which is similar to Section 42A–1–29, was designed to avoid problems in fluctuating real estate values by setting a fixed time for valuation). The Village did not institute condemnation proceedings, which would have clearly established a date of taking. *See* § 42A–1–24(A) (establishing the date the condemnation petition is filed as the date for calculating damages). The record indicates that Tract 1 was purchased by the Village from its owners, Gary and Zoe Nelson, on April 4, 1998. On that date, the ability of the Leighs to enforce the restrictive covenant on Tract 1 was "effectively prevented." *Townsend v. State ex rel. State High-*

*way Dept.,* 117 N.M. 302, 304–05, 871 P.2d 958, 960–61 (1994) (pointing out that property is taken when it is effectively prevented from being used). However, the purchase of the property did not violate the restrictive covenants. It was not until September 26, 2000, that the Village began construction of the drainage pond, and it was not until this point that the Leighs had notice that Tract 1 would be put to public use. The Leighs had the necessary information to contest the Village's action once construction began. Therefore, the date of taking is September 26, 2000. *See Electro–Jet Tool Mfg. Co. v. City of Albuquerque,* 114 N.M. 676, 678, 845 P.2d 770, 772 (1992) (reiterating that an element of an inverse condemnation claim is the taking of property for public use).

{30} Having reversed the district court's judgment, we need not consider the denial of the Village's motion of JNOV.

### III. CONCLUSION

{31} For the reasons stated above, we reverse the district court's judgment awarding the Leighs $50,000 in inverse condemnation damages, and we remand for a calculation of the value of the Leighs' property before and after September 26, 2000.

{32} **IT IS SO ORDERED.**

BUSTAMANTE and KENNEDY, JJ., concur.